NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12391

W. ROBERT ALLISON  vs.  ELOF ERIKSSON & others.[1]

Suffolk.     February 5, 2018. - May 30, 2018.

Present:  Gants, C.J., Gaziano, Budd, Cypher, & Kafker, JJ.


Limited Liability Company.  Damages, Breach of fiduciary duty.


Civil action commenced in the Superior Court Department on
May 22, 2013.

The case was heard by Mitchell H. Kaplan, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Dana Alan Curhan for the plaintiff.
Sean T. Carnathan for the defendants.
Ben Robbins & Martin J. Newhouse, for New England Legal
Foundation, amicus curiae, submitted a brief.


KAFKER, J.  At issue in the instant case is the remedy

available for limited liability company (LLC) mergers undertaken

_____

[1] Gudrun Eriksson, individually and as trustee of the Elof
Eriksson Irrevocable Trust-2003; and Karl H. Proppe,
individually and as trustee of the Elof Eriksson Irrevocable
Trust-2003.

in violation of fiduciary duties.  The defendant, Elof Eriksson, contends that the exclusive remedy for dissenting members to such mergers is the distribution of their interest in the LLC, pursuant to G. L. c. 156C, § 60 (b).  The plaintiff, W. Robert Allison, contends that other equitable relief is available but that the judge erred in declining to rescind the merger.  We conclude that G. L. c. 156C, § 60 (b), provides the exclusive remedy for dissenting members of a limited liability company that has voted to merge, so long as the merger is undertaken in accordance with G. L. c. 156C, §§ 59-63.  Of relevance here is G. L. c. 156C, § 63 (b), which provides that members of a limited liability company owe each other fiduciary duties, but that such duties may be enhanced or restricted according to the terms in the operating agreement.  Where, as here, a member of an LLC conducts a merger in breach of his fiduciary and contractual duties, the merger has not been conducted in compliance with § 63, and the remedy provided by G. L. c. 156C, § 60 (b), is not exclusive.  Thus, the trial judge did not abuse his discretion in fashioning an equitable remedy.  We also affirm most of the equitable relief awarded, but remand that portion of the trial judge's decision which increases Allison's interest in the merged LLC to five per cent, as we cannot discern any basis in the record for that figure.[2]

---

[2] We acknowledge the amicus brief submitted by New England

1.  Background.  We recite the trial judge's relevant findings of fact, supplemented with undisputed evidence from the record.

a.  Formation and operation of Applied Tissue Technologies.  Allison is an experienced corporate attorney who left the legal field in 1997.  Eriksson is the former chief of the division of plastic surgery at a hospital in Boston.  In 1999, Eriksson was looking to start a business based on technology he had developed at the hospital.  He reached out to Allison, and the two eventually agreed to form Applied Tissue Technologies (ATT-MA), a Massachusetts LLC.  Allison contributed $15,000 to the company, and Eriksson contributed $45,000.  Allison received a twenty-five per cent membership interest in ATT-MA; Eriksson received a seventy-five per cent interest.  Allison became the president and chief executive officer (CEO) of the company.

Allison drafted the initial operating agreement for ATT-MA.[3] It provided that Allison and Eriksson were the only members of ATT-MA and that ATT-MA was to be managed by the members, who would vote based on their respective membership interests.  Any additional capital contributions required the unanimous consent of all members.  The judge found that this requirement "is not

Legal Foundation in support of the defendant.

[3] The trial judge found that W. Robert Allison was not acting as Elof Eriksson's attorney when Allison drafted the operating agreement.

uncommon in a joint venture involving two participants who agree that they must both consent to certain, fundamental business changes, even though they do not have equal interests in the profit and loss of the enterprise."

In 2003, Allison and Eriksson each decided to transfer a portion of their respective interests in ATT-MA into trusts for the benefit of their families.  To that end, Allison and Eriksson also executed a new operating agreement that was lengthier and more sophisticated than the original.  It contained several important changes:  (1) it created a manager position, to be elected by voting members; (2) it defined the term, "Original Members," as Allison and Eriksson; (3) both original members had to agree to the addition of any new members; (4) any change to the operating agreement required consent from both original members; (5) any change to the operating agreement that had the effect of reducing a member's interest in ATT-MA or interest in distribution from a sale of assets or cash flow required consent from the affected member; (6) a vote of at least sixty per cent of the membership was required to make significant business decisions.  The agreement further provided that members were entitled to examine ATT-MA's books and records at any and all reasonable times, and that members had a duty to conduct company affairs in good faith. The new operating agreement also maintained a provision from the

original agreement that required both Allison and Eriksson to consent to any further capital contributions. Subsequent to the enactment of the new operating agreement, Allison was elected as manager.

At some point, ATT-MA hired Christian Baker to work as a full-time employee. In 2004, Baker received a two per cent interest in ATT-MA, transferred from Allison and Eriksson according to their twenty-five per cent/seventy-five per cent split. By 2007, ATT-MA could not afford to pay Baker, and his employment was terminated. A dispute arose between Allison and Eriksson about the terms of Baker's termination, which was ultimately resolved by Allison transferring two per cent of his interest in ATT-MA to Eriksson. After this transfer, the membership interests in ATT-MA were as follows: Eriksson owned 55.5 per cent; Eriksson's family trust owned twenty per cent; Allison owned 14.66 per cent; Allison's family trust owned 7.84 per cent; and Baker owned two per cent.

From 2006 to 2008, Eriksson lent ATT-MA $200,000 to cover operating expenses. This sum was later repaid to him with fifteen per cent interest. In March, 2010, Allison stepped down as CEO, and Karl Proppe, Eriksson's close friend, became the new CEO. In November, 2011, Allison resigned as president and manager.

By January, 2012, ATT-MA was almost out of cash. Eriksson was unwilling to lend the company any more money, but indicated he would be willing to invest money in exchange for additional equity. However, Allison was unwilling to have his interest diluted unless the investment came from an outside investor, even though the members generally agreed that ATT-MA was at least one year away from being able to attract outside investors. In response to Allison's stance, Eriksson indicated that the operating agreement should be amended.[4]

Eriksson eventually offered to invest $600,000 if Allison invested $200,000, but Allison rejected the proposal. Allison also refused to use personal assets to secure a bank loan for ATT-MA. Eriksson was frustrated by Allison's position and suggested that ATT-MA should be dissolved.

b. The merger. In February, 2012, Eriksson's daughter arranged for him to meet with a senior attorney at her firm, Gary Schall, to discuss his concerns about the company. They ultimately decided that an appraisal of the company was necessary. Eriksson and Proppe retained Schall and his firm to represent ATT-MA. The judge found that Eriksson, Proppe, and

---

[4] The trial judge explained that Eriksson wanted to amend the operating agreement "presumably so that he could invest equity over Allison's objection, but [he] was non-specific concerning what the amendments should be."

Schall all specifically decided not to let Allison know of Schall's engagement.

ATT-MA hired a firm to conduct the appraisal. Eriksson informed Allison of the appraisal, but not Schall's involvement or the purpose of the appraisal. The appraisal firm concluded that one hundred per cent of ATT-MA's equity had a value of $239,000, but only if $620,000 of additional funding was invested; without the additional $620,000, ATT-MA was worth $0.[5]

In May, 2012, Eriksson and Schall planned how they would deal with Allison. First, Eriksson would offer to purchase Allison's individual and trust membership interests based on the appraisal value. If Allison rejected the offer, Eriksson would form a new LLC under Delaware law (ATT-DE), and create a new operating agreement "that would accomplish Eriksson's goals." ATT-MA would then be merged into ATT-DE.

On May 6, 2012, Eriksson offered to purchase Allison's collective membership interests, totaling 22.5 per cent, for $53,775, i.e., 22.5 per cent of the $239,000 valuation. Allison rejected the offer.

---

[5] The trial judge noted that the appraisal was "curiously principally based on a discounted cash flow valuation, although [ATT-MA] had not generated any significant income in the last few years, and its only significant assets [were] its [intellectual property]." The appraisal company "did not consult with anyone who could value [ATT-MA's intellectual property]."

Later the same month, ATT-DE was created. Proppe, now the manager and CEO of both ATT-MA and ATT-DE, executed the agreement and plan of merger on May 29, 2012. That evening, Eriksson and Proppe informed Allison of the merger. Up to this point, Allison had no prior notice of the merger or Schall's representation of ATT-MA.

The operating agreement for ATT-DE is significantly different from the operating agreement for ATT-MA. The ATT-DE operating agreement creates a class of preferred shares with liquidation preference over common shares, and establishes a board of directors (board) to manage the company.[6] Members have no rights other than to select the directors of the board. Directors of the board are elected by members holding a majority of the company's outstanding shares. As the holder of the majority of the company's shares, Erickson could select the directors. As a minority member, Allison would not have the ability to successfully elect directors by himself. The

---

[6] Section 6.01 of the ATT-DE operating agreement provides in relevant part:

"The business and affairs of [ATT-DE] shall be managed by or under the direction of the Board [of Directors], which shall have the right, power and authority to exercise all of the powers of [ATT-DE] except as otherwise provided by law or this Agreement. . . . Except as may be expressly provided otherwise elsewhere in this Agreement or pursuant to non-waivable provisions of [Delaware's limited liability company act], the Members shall have no voting rights . . . ."

operating agreement also provides that members owe no fiduciary duty to ATT-DE or one another, and attempts to limit all other duties to the extent permitted by Delaware law.[7]  Members do not have the right to access ATT-DE's books or records, or to receive any information about ATT-DE's business or affairs, without the board's authorization.[8]  No membership interest may be transferred without board approval, even to family members.

---

[7] Specifically, § 6.04(a) of the operating agreement states:

"The Members' respective obligations to each other are limited to the express obligations set forth in this Agreement, subject only to the implied contractual covenant of good faith and fair dealing.  No Member shall have any duties or liabilities, including fiduciary duties, to [ATT-DE] or to any other Member, or to the Board or any Director, and the provisions of this Agreement, to the extent that they restrict or otherwise modify, or eliminate, the duties and liabilities, including fiduciary duties, of the Members otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of the Members.  Any standard of care or duty imposed by or under the Act or any other law, rule or regulation (or any judicial decision based on or interpreting the same) shall be modified, waived or limited, to the extent permitted by law, as required to permit each Member to act under this Agreement and to make any decision such Member is authorized to make hereunder in such manner as such Member may determine in his, her or its sole and absolute discretion, subject only to the implied contractual covenant of good faith and fair dealing." (Emphasis added.)

[8] Section 7.01 of the operating agreement provides in relevant part:

"Except as otherwise expressly provided in this Agreement, no Member shall have any right of access to any of the books or records of [ATT-DE] or to receive any information about the business, affairs, properties or

In the meantime, Eriksson quickly purchased $250,000 of preferred shares in ATT-DE. Allison was given the opportunity to purchase enough preferred shares of ATT-DE to maintain his ownership interest, but declined to do so. Instead, Allison challenged the propriety of these transactions. In July, Allison was denied further access to ATT-MA's offices, which now belonged to ATT-DE.

Over the next eighteen months, Eriksson purchased preferred shares in ATT-DE, totaling $923,536. As a result, by January, 2014, Allison's combined interests in ATT-DE had been reduced to only 3.32 per cent. His interests would also be subordinated to preferred shareholders' interests in the event of a liquidation.

Allison, Eriksson, Proppe, and Schall met to attempt to resolve Allison's claim that Eriksson had committed a breach of his fiduciary duties by authorizing the merger and purchasing preferred shares. Schall asked Allison if he would rather have 3.32 per cent of an ongoing business or 22.5 per cent of a defunct one. Allison responded that he would prefer a larger percentage of the failed business.

Eriksson appeared to be willing to amend some of the provisions of ATT-DE's operating agreement in Allison's favor.

---

ownership of [ATT-DE] unless the Board determines, in its discretion in compliance with [§ 6.04(b)], to grant such access or to provide such information to one or more Members."

In particular, he seemed willing to provide Allison with access to information and the opportunity to confer on decisions affecting ATT-DE, as well as a right of first refusal on additional investments or the sale of shares. However, Eriksson was unwilling to reclassify his own investments as debt and restore Allison's prior ownership interests in the company. Allison would not agree to any compromise that did not include the restoration of his equity without the risk of dilution, except from a third-party investment.

Eriksson's son-in-law, Michael Broomhead, became CEO of ATT-DE in November, 2012. Broomhead actively looked for investors without success. Broomhead invested $10,000 in ATT-DE and Proppe invested $30,000.

In May, 2013, Allison brought suit against Eriksson, Eriksson's wife, and Proppe, seeking a preliminary injunction of the merger. The motion judge ordered ATT-DE to allow Allison to examine its books and records at reasonable intervals, but otherwise denied the preliminary injunction.

In his complaint, Allison brought claims for breach of contract, intentional interference with advantageous relations, breach of fiduciary duty, civil conspiracy, and declaratory judgment. After a jury-waived trial, Allison prevailed on his claim against Eriksson for breach of fiduciary duty, but lost on

all other claims.[9]  The judge granted equitable relief, ordering the following amendments to the operating agreement of ATT-DE: (1) the rescission of § 6.01, such that members shall have voting rights as provided under Delaware law; (2) the rescission of § 6.04 to the extent that it eliminated members' fiduciary duties to one another, and to directors, officers, and shareholders; (3) the rescission of the first two sentences of § 7.01, such that members may access the company's books and records; (4) the addition of a provision requiring the directors to "report to Allison either orally or in writing on the business and affairs of" ATT-DE, to timely advise him of anticipated extraordinary business events, and to provide him with a copy of ATT-DE's annual financial statements, if any. The judge also ordered that the combined membership interest of Allison and the Allison Trust be "grossed up" to five per cent and not be subject to dilution without a bona fide outside investment.  Any such dilution must be on the same terms as holders of common or preferred shares of ATT-DE.  If ATT-DE should be liquidated before receiving any outside investment, Allison's interest must be "treated pari passu with the preferred shareholders."

---

[9] Allison did not appeal from the judgment on any of these other claims.

The parties cross-appealed. We transferred the appeals to this court on our own motion.

2. _Discussion_. a. _Relevant provisions of G. L. c. 156C_. We must first determine whether distribution is the exclusive remedy for a minority shareholder of an LLC who has objected to a merger that breaches fiduciary duties. The governing provision is G. L. c. 156C, § 60 (b). Where a minority member objects to the merger, but the majority of members vote to merge anyway, G. L. c. 156C, § 60 (b), provides:

> "The exclusive remedy of a member of a domestic limited liability company, which has voted to consolidate or to merge with another entity under the provisions of [G. L. c. 156C, §§ 59-63], inclusive, who objects to such consolidation or merger, shall be the right to resign as a member and to receive any distribution with respect to his limited liability company interest, as provided in [G. L. c. 156C, §§ 31-37], inclusive. Such members and the resulting or surviving entity shall have the rights and duties, and shall follow the procedure set forth in said sections."

For questions of statutory interpretation, we look first to the text of the statute. _Phillips_ v. _Equity Residential Mgt., L.L.C._, 478 Mass. 251, 257 (2017). In so doing, we must examine "the language of the entire statute, not just a single sentence" or phrase, "and attempt to interpret all of its terms 'harmoniously to effect the intent of the Legislature.'" _Id._, quoting _Commonwealth_ v. _Hanson H._, 464 Mass. 807, 810 (2013). Here, the statute expressly provides for distribution of the dissenting member's interest in the LLC as an exclusive remedy

where an LLC has voted to merge "under the provisions" of G. L. c. 156C, §§ 59-63. We must therefore consider the requirements of the cross-referenced sections, particularly § 63, to understand the scope of the exclusive remedy provision.[10],[11]

General Laws c. 156C, §§ 59-62, address the mechanics and consequences of merging or consolidating an LLC. By contrast, G. L. c. 156C, § 63, defines the scope of a member's or

---

[10] We note that unlike G. L. c. 156D, the Commonwealth's most recent business corporations statute, which provides detailed commentary from its drafters, the legislative history on G. L. c. 156C is less clear. See Halebian v. Berv, 457 Mass. 620, 624-625 (2010), and authorities cited. The authors of G. L. c. 156C took guidance from a number of sources, including the existing corporate statutes, the Massachusetts Uniform Limited Partnership Act, other States' limited liability company (LLC) statutes, and the American Bar Association (ABA) Prototype LLC Act. Parker, The Limited Liability Company: An Introduction, 39 Boston B.J. 8, 12 (1995). However, the language in G. L. c. 156C, § 60 (b), does not appear to be taken from a single source. The ABA's Prototype LLC Act does not even provide a distribution remedy for mergers. See American Bar Association, Working Group on Prototype Act, Prototype Limited Liability Company Act, at § 1202 commentary, at 88 (Nov. 19, 1992). The Massachusetts Uniform Limited Partnership Act does not contain "exclusive remedy" language. See G. L. c. 109, §§ 1A, 16A. As Eriksson points out, the then most recent business corporations statute, G. L. c. 156B, contains an "exclusive remedy" provision, but provides an exception for "illegal or fraudulent" corporate actions. See G. L. c. 156B, § 98.

[11] Eriksson asserts that interpreting G. L. c. 156C, § 60 (b), in reference to G. L. c. 156C, § 63, is barred by the fact that Allison did not make this particular statutory interpretation argument below. Although Allison did not explicitly rely on G. L. c. 156C, § 63 (b), below, he did raise the issue of how § 60 should be constructed and thus the issue is properly before us. See Wilcox v. Riverside Park Enters., Inc., 399 Mass. 533, 535 n.5 (1987).

manager's duties and liabilities.  Specifically, § 63 (b)

states:

> "To the extent that, at law or in equity, a member or manager has duties, including fiduciary duties, and liabilities relating thereto to a limited liability company or to another member or manager, (1) any such member or manager acting under the operating agreement shall not be liable to the limited liability company or to any such other member or manager for the member's or manager's good faith reliance on the provisions of the operating agreement, and (2) the member's or manager's duties and liabilities may be expanded or restricted by provisions in the operating agreement."

This provision establishes the rules governing fiduciary and

contractual duties in LLCs, including the fiduciary duties

applicable to mergers.  The subsection's opening statement about

"[t]o the extent that" such duties exist "at law or in equity,"

is best read as an acknowledgement that the courts define and

determine the nature of such duties, and that the courts provide

for their enforcement as default rules.  See Piemonte v. New

Boston Garden Corp., 377 Mass. 719, 723 (1979) (consideration of

Delaware judicial decisions appropriate where Massachusetts's

provision is based on similar Delaware statute); Feeley v.

NHAOCG, LLC, 62 A.3d 649, 661-662 (Del. Ch. 2012) (court

interpreting analogous phrase in Delaware's LLC statute

concluded Legislature was not "agnostic" about existence of

fiduciary duties but recognized that they do exist).[12]  See also

---

[12] General Laws c. 156C, § 63 (b), appears to be taken almost verbatim from the 1992 version of Delaware's LLC

R.W. Southgate & D.W. Glazer, Massachusetts Corporation Law and Practice § 19.4 (2d ed. 2012 & Supp. 2018) ("better reading [of 'to the extent' clause] is . . . to leave the fiduciary duties of members and managers to the courts to define over time"). The LLC statute further allows, however, for the modification of these duties.  According to § 63 (b), such duties and liabilities "may be expanded or restricted by provisions in the operating agreement."  This recognizes that "[a]n LLC is primarily a creature of contract, and the parties have wide contractual freedom to structure the company as they see fit." Seneca Invs. LLC v. Tierney, 970 A.2d 259, 261 (Del. Ch. 2008). Additionally, § 63 (b) provides that a member's or manager's good faith reliance on the operating agreement provides a defense to liability.

The merger here was done in contravention of the duties recognized in § 63 (b) and does not fall under the good faith defense provision.  As the trial judge correctly found, Eriksson

---

fiduciary duty provision, Del. Code Ann. tit. 6, § 18-1101 (c) (2013).  Delaware's LLC Act has since been amended to allow LLCs to eliminate fiduciary duties, but our interpretation of § 63 (b) remains consistent with the Delaware Chancery Court's interpretation that the LLC fiduciary duty provision provides for the existence of fiduciary duties, and their enforcement as default rules in the absence of contractual modification.  See Feeley v. NHAOCG, LLC, 62 A.3d 649, 661-663 (Del. Ch. 2012); Auriga Capital Corp. v. Gatz Props. LLC, 40 A.3d 839, 851 (Del. Ch. 2012).

clearly committed a breach of his fiduciary duties.  Indeed, this is undisputed on appeal.

Although § 63 (b) provided Allison and Eriksson the ability to restrict members' and managers' duties, they chose instead to expand them.  ATT-MA's operating agreement expressly prohibited many of the consequences of this merger, such as the ability to dilute a member's interest without that member's consent, the ability to amend the operating agreement without the original members' consent, and the ability to cut members out of the management of the company.  Thus, Eriksson was not acting in good faith reliance on the operating agreement when he conducted the merger in secret, so as to subvert each of these explicit protections.

The many minority protections provided in ATT-MA's operating agreement also indicate that the company was set up to establish protections akin to those provided at law to a close corporation.[13]  Because close corporations often involve a small number of owners, who are "quite dependent on one another for the success of the enterprise[,] . . . the relationship among the stockholders must be one of trust, confidence and absolute

---

[13] A closely held corporation is defined as having (1) a small number of shareholders; (2) no ready market for the corporation's shares; and (3) substantial majority shareholder participation in the management, direction, and operations of the corporation.  See Brodie v. Jordan, 447 Mass. 866, 868-869 (2006), quoting Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 586 (1975).

loyalty if the enterprise is to succeed." <u>Donahue</u> v. <u>Rodd Electrotype Co. of New England, Inc</u>., 367 Mass. 578, 587 (1975). The nature of these close corporations imposes a duty of "utmost good faith and loyalty" (citation omitted). <u>Id</u>. at 593. The minority protections in ATT-MA's operating agreement established an analogous relationship and duty among its members, and thus, the close corporation doctrine, and the strict fiduciary duty it imposes, applies here.[14]

The trial judge correctly found that "Eriksson certainly did not act with utmost good faith toward Allison." Eriksson does not challenge this finding, nor could he. Eriksson initiated the merger in secret, acting covertly in order to dilute Allison's interest in the company and remove Allison's minority rights, which were both expressly protected by ATT-MA's operating agreement.

As we have explained, "the danger of abuse of fiduciary duty is especially great in a freeze-out merger." See <u>Coggins</u> v. <u>New England Patriots Football Club, Inc</u>., 397 Mass. 525, 534 (1986), <u>S.C</u>., 406 Mass. 666 (1990). In close companies and close corporations, such freeze-outs defeat "the reasonable

---

[14] Not all LLCs are close companies. The test for whether a corporation is closely held, see note 13, <u>supra</u>, is not dispositive for determining whether an LLC is closely held. As LLCs are creatures of contract, determining whether an LLC is closely held is a more fact-specific determination that will depend on the way in which a particular LLC is structured.

expectations" of minority shareholders.  See Pointer v. Castellani, 455 Mass. 537, 550 (2009).  Here we have such a freeze-out merger.

In sum, we are presented with a merger that clearly contravenes the fiduciary and contractual duties recognized in § 63 (b).  The question that remains is whether such a merger may still be characterized as a merger "under the provisions of [G. L. c. 156C, §§ 59-63]," and therefore be covered by the exclusive remedy provision of § 60 (b).  We conclude that it cannot for the following reasons.

First, the exclusive remedy provision is expressly limited to mergers conducted "under the provisions of [G. L. c. 156C, §§ 59-63]."  It would be anomalous to treat a merger conducted in contravention of the fiduciary and contractual duties identified in § 63 (b) as a merger "under" § 63.  This is especially true given the great flexibility provided to LLCs by statute either to restrict or enhance duties.  Here, instead of restricting fiduciary duties, the operating agreement structured the LLC as a closely held company designed to prevent the very freeze-out accomplished by the merger.

We also have held that "a freeze-out merger in technical compliance" with G. L. c. 156B or 156D does not divest the courts of their equitable jurisdiction, and shareholders who dissented to the merger "are not limited to the statutory remedy

of judicial appraisal [and distribution]," where the majority has violated its fiduciary duties. See Coggins, 397 Mass. at 532 & n.13, 533. See also G. L. c. 156D, § 13.02 (e) (preserving Coggins holding for corporations formed under G. L. c. 156D). We conclude that the same principles apply here given how Erickson and Allison structured the LLC, imposing contractual and fiduciary duties on each other, including those designed not to allow the freeze-out and cash-out of one by the other.

Eriksson argues that G. L. c. 156C, § 60 (b), must nonetheless be the exclusive remedy here because, unlike G. L. c. 156B, § 98, or G. L. c. 156D, § 13.02 (e), the two business corporation statutes discussed supra, it does not contain an explicit exception for illegal or fraudulent corporate actions. However, Eriksson's interpretation ignores § 60 (b)'s cross-reference and incorporation of § 63 (b) and the fiduciary and contractual duties and defenses it defines. As we have explained, a merger in violation of the duties and defenses established in § 63 (b) is not a merger "under" § 63. Although compliance with § 63 (b) is a precondition rather than an exception to § 60 (b), it serves the same purpose as the exceptions found in G. L. c. 156B and G. L. c. 156D.

Finally, we conclude that if it was the Legislature's understanding that merger would provide a unilateral means for

majority members to extinguish fiduciary duties and freeze out minority members from LLCs, it would have said so expressly. Although we recognize that the scope of the exclusivity provision for LLC mergers could have been more clearly written, we conclude that the Legislature would not have intended to create anything less than a transparent means of extinguishing fiduciary duties and freezing out minority members. See Gevurtz, Squeeze-Outs and Freeze-Outs in Limited Liability Companies, 73 Wash. U.L.Q. 497, 533 (1995) ("even if majority expulsion is the better default rule, it should be explicit in the statute rather than hidden in merger provisions").

Thus, we hold that in this case, where the merger of an LLC constitutes a breach of fiduciary and contractual duties in contravention of G. L. c. 156C, § 63 (b), G. L. c. 156C, § 60 (b), does not prevent the courts from providing the dissenting members with an equitable remedy other than the statutory right of distribution. See Coggins, 397 Mass. at 532 & n.13, 533. Thus, a majority member may not rely on § 60 (b) to exclude all other equitable relief when he or she has initiated a merger in breach of his or her existing fiduciary and contractual duties.

b. Propriety of the remedy. The proper remedy for a freeze-out merger is one that "will put [the minority member] in the position he would have been in had the freeze-out not

occurred, and compensates him for the denial of his reasonable expectations." Pointer, 455 Mass. at 560. See Brodie v. Jordan, 447 Mass. 866, 870-871 (2006) (remedy for freeze-out "should, to the extent possible, restore to the minority shareholder those benefits which she reasonably expected, but has not received because of the fiduciary breach"). This "remedy should neither grant the minority a windfall nor excessively penalize the majority." Id. at 871. The remedy must also take into account the passage of time and changed circumstances. See Coggins, 397 Mass at 536. The LLC merger egg may not always be unscrambled. Courts therefore have broad equitable powers in specifying the appropriate remedy, and their choice of remedy is reviewed for abuse of discretion. See Brodie, supra at 871.

Here, the trial judge carefully crafted an equitable remedy, amending specific provisions in ATT-DE's operating agreement that had diminished Allison's rights. The judge's amendments recreate Allison's minority member protections to the largest extent possible under Delaware law, within the existing structure of ATT-DE. Despite this, Allison insists that the only appropriate remedy was to rescind the merger and restore Allison's interest in ATT-MA. We disagree.

A judge need not order rescission of a freeze-out merger if it would not be in the best interest of the company. See

Coggins, 397 Mass. at 536. This litigation has gone on for five years, and concerns a merger that occurred six years ago. See id. (rescission of merger not equitable where litigation lasted many years and prior position of parties was difficult to restore). Despite being a sophisticated corporate attorney, Allison waited seven months after settlement negotiations had ended to file suit. By that point, the merger had been in place for nearly one year and Eriksson had already invested over $500,000 in ATT-DE. Rescinding the merger and backing out Eriksson's additional equity six years later would be complicated and inequitable. Further, the merger was precipitated by Allison's refusal to invest additional money in ATT-MA while preventing Eriksson from making capital contributions. Indeed, the trial judge found that "Allison's position that he would not invest anything more in [ATT-MA] or secure its debt with personal assets, while simultaneously asserting his right against diluting his interest, does not appear consistent with his own fiduciary responsibilities to Eriksson." Under these circumstances we discern no abuse of discretion in the judge's decision to amend ATT-DE's operating agreement to restore Allison's minority protections instead of rescinding the merger. See Demoulas v. Demoulas, 432 Mass. 43, 67 (2000), quoting Clark v. Greenhalge, 411 Mass. 410, 417 (1991) ("one who seeks equity must do equity and . . . a court

will not permit its equitable powers to be employed to accomplish an injustice").

In addition to amending ATT-DE's operating agreement, the judge increased Allison's ownership interest to five per cent. Any such equitable change to Allison's ownership interest in ATT-DE should, in combination with the amendments to ATT-DE's operating agreement, "attempt to reset the proper balance between the majority's 'concede[d] . . . rights to what has been termed 'selfish ownership,' . . . and the minority's reasonable expectations of benefit from its shares." Brodie, 447 Mass. at 871, quoting Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 850-851 (1976). Here, however, the judge did not explain how he settled on the five per cent figure. The only potential basis for this increase that we can identify in the record is Allison's transfer of two per cent of his interest to Eriksson after their disagreement over Baker's termination. Yet the judge's findings do not explain whether this was the reason for increasing Allison's interest. Further, a two per cent increase would give Allison a 5.32 per cent interest in the company, not five per cent exactly. Accordingly, we deem it appropriate to remand this matter on the question whether and to what extent Allison's interest in ATT-DE should be increased, and the reasons for any increase provided. See Pointer, 455 Mass. at

560 (remand ordered where appropriate remedy depended on further fact finding).

3. <u>Conclusion</u>. For the reasons discussed, the judgment below is affirmed, except with respect to the issue of Allison's ownership interest percentage in ATT-DE. We remand to the Superior Court for further explanation on the propriety of increasing Allison's interest to five per cent.

<u>So ordered</u>.