NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-638

INNOVATION PHARMACEUTICALS INC.

vs.

CUMMINGS PROPERTIES, LLC.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The question before us is whether the plaintiff, Innovation Pharmaceuticals Inc. (IPI), provided sufficient notice to its landlord, defendant Cummings Properties, LLC (Cummings), that IPI was not extending its commercial lease, so as to prevent the lease from automatically extending for another five years.  The lease required a specific type of written notice to opt out of the automatic extension provision, and IPI did not comply with this notice requirement.  IPI claims that it nevertheless provided sufficient notice, because in 2018, during the time period set by the lease for opting out of the automatic extension, IPI had multiple e-mail and oral communications with

Cummings in which IPI expressed its "intent" to move to a different location.

The trial judge rejected IPI's argument. In a detailed, fifty-two-page memorandum, the judge found that although the parties certainly discussed IPI's interest in leasing a smaller space, "IPI never gave definitive written notice . . . or even clear oral notice (albeit not in compliance with [the lease]) that IPI was . . . deciding against renewing the lease." In so ruling the judge considered and distinguished our recent decision in Sourcing Unlimited, Inc. v. Cummings Props., LLC, 102 Mass. App. Ct. 653 (2023) (Sourcing Unlimited), which addressed the identical notice language in a Cummings lease, reasoning that in Sourcing Unlimited the notice was "unequivocal and timely" (although by an unauthorized method), whereas in this case "no such unequivocal notice" was provided. Accordingly, the trial judge ruled in favor of Cummings and awarded it $810,251 in liquidated damages.

On appeal IPI presses two principal arguments. First, IPI insists, based on the testimony of a Cummings employee, Joseph Martin, that Cummings had actual knowledge that IPI did not intend to continue with the lease. IPI argues that the judge failed to address Martin's testimony regarding his alleged actual knowledge, and that under our case law, actual notice is sufficient as a matter of law. IPI's second argument is more of

2

a legal argument -- IPI contends that regardless of the notice provisions in the lease, notice is "adequate" if it "conveys with reasonable certainty that the notifying party does not intend to continue," and that IPI provided such notice here. IPI also challenges the enforcement of the liquidated damages provision in the lease.

For the reasons discussed below, we are not persuaded. IPI failed to comply with the notice provision of the lease, and the facts it relies upon for notice here involve tentative or preliminary communications, much less definite than those that justified the exception we recognized in Sourcing Unlimited. Moreover, the contractual notice provision is clear, and generally we enforce contractual provisions as written; we disagree with IPI's effort to in essence rewrite the contractual notice provision to make it more subjective and less clear. The liquidated damages provision is also enforceable under our case law. We accordingly affirm.

Background. "We recite the trial judge's relevant findings of fact, supplemented with undisputed evidence from the record." Allison v. Eriksson, 479 Mass. 626, 627 (2018). IPI is a publicly traded biopharmaceutical company that regularly engages

3

in complex commercial transactions.[1]  Cummings is a commercial

real estate management company that leases real estate for

purposes including office and laboratory space.

1.  Provisions of the lease.  In July of 2008, IPI and

Cummings executed a commercial lease for laboratory space in

Beverly (2008 lease).  The term of the 2008 lease was five

years, from October 1, 2008, to September 30, 2013.  Dr. Krishna

Menon (Dr. Menon), who was then the Chief Science Officer of

IPI, signed the lease on behalf of IPI.[2]

The 2008 lease contained several provisions relevant to

this appeal.  As to extensions of the lease, Paragraph M of an

attached rider provided IPI with a one-time option to extend the

lease for five years.  To exercise this option, IPI was required

to serve Cummings with written notice not earlier than twelve

months, nor later than six months, prior to the expiration of

the initial lease term.

The original lease extension period, from October 2012 to

March 2013, expired without IPI exercising its option to extend.

However, in August of 2013, IPI and Cummings executed a document

---

[1] Prior to May of 2017, the company's name was Cellceutix.
For convenience, we refer to the plaintiff company as IPI
throughout.

[2] KARD, Inc. (KARD), a company owned by Dr. Menon and
members of his family, was also a co-lessee.  KARD is not a
party to this appeal.

titled "Lease Extension #1" (2013 extension), which extended the lease by five years. The 2013 extension was also signed by Dr. Menon, this time as President of IPI.

The 2013 extension included the following provision (automatic extension provision):

"The lease, including all terms, shall be automatically extended for additional successive periods of five year(s) each unless LESSOR or LESSEE serves written notice, either party to the other, of either party's option not to so extend the lease. The time for serving such written notice shall be not more than 12 months or less than six months prior to the expiration of the then-current lease period. Time is of the essence."

Accordingly, the 2013 extension imposed on IPI the obligation to give written notice that IPI was exercising its option not to extend, between October 1, 2017, through March 30, 2018; if IPI did not do so, the lease would automatically extend.

As to the manner of notice, Section 21 of the 2008 lease, titled "NOTICE," included the following:

"Any notice from LESSEE to LESSOR under this lease shall be given in writing and shall be deemed duly served only when served by constable, or delivered to LESSOR by certified or registered mail, return receipt requested, postage prepaid, or by recognized courier service with a receipt therefor, addressed to LESSOR at [Cummings's address]. No oral, facsimile or electronic notice shall have any force or effect. Time is of the essence in the service of any notice."

Thus, for IPI to exercise its option not to extend, it needed to provide written notice in accordance with the provisions of Section 21, by March 30, 2018.

5

2.  Facts regarding notice.  In June of 2017, Joseph Martin, Cummings's account manager for IPI, met with Dr. Menon and his daughter Anita Menon (Anita), then an employee of IPI. IPI informed Martin that IPI needed to have its board of directors approve any lease extension, and that accordingly IPI would not consider an extension until the end of 2017, and would not sign an extension until the beginning of 2018.  The six-month extension window began in October of 2017.  In December of 2017, Martin followed up and asked Anita about IPI's future space needs; in response, Anita told Martin that IPI "d[id] not have an update for you at this time.  When we do I will make sure to reach out."

By February of 2018, both Dr. Menon and Anita had left IPI. Two employees of IPI, Nancy Chloodian, the then-office manager, and Jane Harness, a vice president, took over as IPI's contacts with Cummings, and on February 6, 2018, they requested a meeting with Martin.  At that time, IPI had not yet decided whether it wanted to remain in the premises.

On February 13, 2018, a key meeting occurred between Chloodian and Harness, on behalf of IPI, and Martin and Stephen Drohosky, Cummings's general manager of the Beverly property. During this meeting the parties discussed IPI's space needs going forward, and it is not disputed that the discussion included the potential for IPI to downsize or relocate.

However, other aspects of what was discussed were disputed at trial. While Harness and Chloodian claimed that the purpose of calling the meeting was to inform Cummings that IPI was leaving, the judge found, to the contrary, that "neither Harness nor Chloodian expressly stated that the decision to opt out of the automatic renewal of the lease ever occurred during the February 13, 2018 Meeting." Furthermore, the judge found that during the meeting, the Cummings representatives expressly advised IPI to consult the lease, and in particular, its notice provisions. Thus, "Drohosky specifically and clearly informed Harness and Chloodian of the Extension Provision and IPI's obligation to provide written notice if it intended to opt out of the Extension Provision." The judge also found that "Drohosky specifically informed Harness and Chloodian that they must read the lease documents in full for information and details about terminating the lease and vacating the space, and that they should talk to a third-party expert." Critically, the judge found that "[i]n light of the communications at the February 13, 2018 Meeting, Drohosky and Martin expected that, if IPI decided to opt out of the automatic extension, IPI knew how to exercise that option by serving written notice by one of the agreed-upon methods in Section 21 of the [2008] Lease."

Although the parties continued to communicate after the February 13 meeting, the judge found that none of these emails

7

"affirmatively stated that IPI was moving out of the Premises or opting out of the automatic renewal extension, and none provided notice of IPI's intentions to do so." Thus, after the meeting concluded, Martin sent plans of several alternative spaces; Harness responded the next day to set up a tour, and stated that IPI "would also appreciate talking with you further about the exit requirements." Following the tour, on February 20, 2018, Harness sent an e-mail message to Martin stating that the tour "helped confirm to us that we are looking for between 2000 and 2500 sq feet." Harness further stated that, "[g]iven that we have time to work out where, exactly, we may want to be based we'll hold off from investigating other properties . . . and instead concentrate on getting folks in to quote on the time and cost it will take to appropriately clear and clean[]out our current space." As indicated, the judge found that "[t]he communications from IPI in these emails also did not expressly state that IPI was moving out of the Premises or opting out of the automatic extension, and none provided notice of IPI's intention to do so."

Throughout the end of February and the beginning of March, IPI and Cummings continued to discuss IPI's downsizing. Again, the judge found that these communications did not state that IPI was moving out of the premises, nor terminating the automatic extension. On March 2, 2018, Chloodian sent an e-mail message

8

to Martin asking after properties in Woburn; Chloodian told Martin that "it may be too early for us to commit to new space-- although we are working to clear out and clean the lab area [of the premises]." On March 9, 2018, Harness asked for a copy of the lease, and in response Martin sent her the 2008 lease and 2013 extension. However, neither Harness nor Chloodian ever read the key language regarding automatic extension in the 2013 extension.

In the face of these findings, IPI relies primarily on testimony of Martin, to the effect that he "understood," at certain points prior to March 30, 2018, that IPI "intended" to vacate the premises at the end of the lease. For example, Martin testified that following the February 13 meeting, Martin "understood" that IPI "no longer intended" to remain at the premises. Following Harness's February 14, 2018 e-mail message, in which Harness asked about the "exit requirements," Martin testified that Harness was talking about "an intention to relinquish the premises." Additionally, Martin testified that as of March 13, his understanding was that IPI "did not intend to occupy the current premises in the following lease term." The judge did not make findings that directly addressed this testimony, although the judge's rulings, in toto, did address the legal effect of IPI's various statements.

3. _Extension of the lease and breach_.  On March 30, 2018, the opt-out period expired.  Six days later, on April 5, 2018, Cummings informed IPI that the lease had automatically extended. IPI disputed that the automatic extension had gone into effect, but nevertheless continued to occupy the premises and to pay rent for over one year after the extended lease term began on October 1, 2018.

On January 1, 2020, fifteen months into the extended lease term, IPI stopped paying rent.  In January of 2020, IPI filed this lawsuit against Cummings, seeking a declaratory judgment that the automatic extension provision was unenforceable, and claiming breach of contract, breach of the implied covenant of good faith and fair dealing, and a violation of c. 93A. Cummings filed a counterclaim for breach of contract, in which Cummings sought, as liquidated damages, the remainder of the rent owing for the five-year term.  In the alternative, to the extent that the lease did not automatically extend, Cummings sought to recover use and occupancy payments, in excess of the monthly rent, for the fifteen months that IPI had occupied the premises, in accordance with Section 22 of the 2008 lease.[3]

---

[3] Two other provisions of the 2008 lease are relevant to this appeal.  Section 20 of the 2008 lease, titled "DEFAULT AND RENT ACCELERATION," provided that if IPI failed to pay rent, and failed to cure its default, the entire balance of rent due would immediately become payable as liquidated damages.  Section 22 of the 2008 lease, titled "OCCUPANCY," provided that if IPI

10

After a bench trial in August and September of 2023, the judge issued her written findings of fact and rulings of law. The judge concluded that the lease included the automatic extension provision, and that IPI did not provide sufficient written notice to opt out of the automatic extension. Specifically, the judge found that the oral and written communications between IPI and Cummings were "devoid of the requisite certainty that IPI was opting out" of the extension, in that such communications did not provide "unequivocal notice."  As a result, the judge found that the lease extended, and that IPI was in breach thereof.

As to liquidated damages, the judge found that the premises had been vacant for three years prior to IPI assuming occupancy, that the premises remained vacant for more than a year after IPI left, and that even had the premises been re-leased, Cummings still could have suffered damages because a potential tenant could have leased another of Cummings's vacant spaces instead. The judge awarded Cummings $810,251.36 in liquidated damages in accordance with Section 20 of the lease, minus IPI's security deposit of $77,600, finding that IPI offered no evidence supporting the invalidation of the liquidated damages provision.

---

occupied the premises after the termination of the lease without permission, then IPI would be liable for use and occupancy payments at double the greater of (1) the monthly rent or (2) Cummings's published rent for the premises.

11

In the alternative, "to the extent an appellate court may determine that the Lease did not automatically extend," the judge awarded Cummings damages for use and occupancy. This appeal followed.

Discussion. 1. Extension of the lease. IPI argues that despite its noncompliance with the procedure set by the lease for exercising its option not to extend, it nevertheless gave sufficient written notice to prevent the automatic extension, and that strict compliance with the terms of the lease was not required. On appeal of a judgment following a bench trial, we review the judge's findings of fact for clear error, and the judge's legal conclusions de novo. H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13 (2022). "The interpretation of an unambiguous written contract constitutes a ruling of law that is subject to plenary review on appeal." Sourcing Unlimited, 102 Mass. App. Ct. at 658, quoting President & Fellows of Harvard College v. PECO Energy Co., 57 Mass. App. Ct. 888, 891 (2003). Furthermore, "[w]hat constitutes timely notice under [a lease] is a matter of contract interpretation and is therefore a matter of law for the court" (citation omitted). Sourcing Unlimited, supra.

In deciding the question before us, we do not write on a blank slate. This court has addressed the automatic extension provisions in Cummings's leases on several occasions, most

12

recently in Sourcing Unlimited.[4]  In that case, which involved nearly identical automatic extension and notice provisions (including the same prohibition on electronic notice), a tenant sent an e-mail message to Cummings during the six-month opt-out period, stating that "[a]t this time [the tenant has] decided we are closing the office in Beverly at the end of the contract." Sourcing Unlimited, 102 Mass. App. Ct. at 655.  In a subsequent e-mail message to Cummings during the opt-out period, the tenant stated that "[a]s you know we will not be renewing our Cummings Center lease."  Id.  The tenant did not, however, send written notice by mail or any other method permitted by the lease.  Id. at 654-656.

In analyzing whether the tenant's e-mail notice was sufficient despite the plain language of the lease, this court in Sourcing Unlimited noted that "as a general rule, option provisions are strictly construed."  Id. at 659.  However, "our jurisprudence has distinguished material flaws in the exercise of an option from immaterial, or inconsequential, deviations, particularly those involving the method of delivery of notice where neither the timeliness nor fact of delivery of notice were disputed" (quotations omitted).  Id. at 661.  Furthermore, where (as in Sourcing Unlimited and in the case at bar) an option is

---

    [4] See SpineFrontier, Inc. v. Cummings Props., LLC, 96 Mass. App. Ct. 1103 (2019) (rule 1:28 decision).

13

bilateral as opposed to the typical unilateral option, "the policy underlying the rule of strict compliance is somewhat less compelling." Id. at 662.

Applying these principles, the court looked to "the gravamen of the option provision in the lease, which is to require the party exercising the option to timely inform the other party, in writing, that it is not renewing the lease;" in Sourcing Unlimited it was undisputed that the tenant satisfied these conditions. Id. at 662. Accordingly, "the clear, timely, unambiguous written notice provided by the tenant and received and acknowledged by the landlord constituted effective notice to invoke the lease nonrenewal option before us." Id. at 663. The court summarized its holding in material part as follows:

> "Although the 'notice' provision in the lease prohibited electronic notice, we nonetheless hold that the e-mail communications constituted effective notice where (1) it is undisputed that the landlord received timely and unequivocal written notice of the tenant's decision not to extend the lease; (2) the nonconformity in the method of delivery of the notice neither was consequential nor contravened the crux of the option provision; and (3) [the option was bilateral]" (emphasis added).

Id. at 653-654.

IPI's first argument as to why the lease did not automatically extend is that in the case at bar, Cummings had "actual knowledge" based on IPI's e-mail messages (and related oral communications) that IPI had opted not to extend the lease, and that given such actual knowledge, defects in the delivery of

14

notice should not render such notice ineffective.  See Sourcing Unlimited, 102 Mass. App Ct. at 661.  IPI relies on Martin's testimony that he believed for much of February and March of 2018 that IPI "intended" to leave the premises.  IPI contends that this testimony was uncontroverted, that the judge did not address it, and that the testimony demonstrated Cummings's actual knowledge that IPI would not be re-leasing the premises.

The above argument is predicated on a factual assertion -- that Cummings had actual knowledge of a decision by IPI not to extend -- that cannot be squared with the judge's findings. Specifically, the judge found that Drohosky and Martin expected that, if IPI decided not to extend the lease, IPI would exercise its option by serving written notice in accordance with the lease.  Inherent in this finding is that Drohosky and Martin did not perceive any other IPI communications as providing final notice that IPI was not extending its lease, or as supplying a basis for actual knowledge of same.  Nor can IPI's argument be squared with the judge's multiple findings that none of IPI's e-mail messages in February and March of 2018 stated, affirmatively, that IPI was moving out of the premises, or opting out of the automatic extension.  Thus, in contrast to Sourcing Unlimited, 102 Mass. App. Ct. at 662, where the tenant clearly stated that it was not renewing its lease, and where Cummings offered "no persuasive argument that [the tenant's]

15

multiple communications within the opt-out period created any uncertainty for Cummings," here there was such uncertainty. The judge found that Cummings expected, and did not receive, written notice in accordance with the lease, and that IPI's e-mail messages never stated that IPI was not extending the lease. Although the judge did not make an express finding regarding whether Cummings had actual knowledge that IPI had decided not to extend the lease, the inescapable conclusion from the judge's findings is that Cummings did not have such knowledge, and that Cummings instead perceived IPI's e-mail messages as an expression of a present "intent" rather than binding notice that IPI was exercising its option not to extend.[5] See FOD, LLC v. White, 99 Mass. App. Ct. 407, 412 (2021), quoting Buster v. George W. Moore, Inc., 438 Mass. 635, 642 (2003) ("We may only find clear error where the judge's findings are not 'supported

_____

[5] IPI's argument includes a legal assertion as well, to the effect that any contractual notice provision may be satisfied by proof of "actual notice." This assertion is at variance with our case law, and for good reason. A contracting party may insist on a particular type of notice for purposes of certainty, and to avoid disputes. In commercial real estate negotiations (no less than other negotiations), tenants may posture that they may not be renewing a lease to obtain sought after concessions. Thus, one reason for specific notice requirements is to avoid having statements of future intent confused with actual notice. Communications at material variance from a contract's notice requirements are not adequate notice, even if the receiving party could be said to have "actual knowledge." See Sourcing Unlimited, 102 Mass. App. Ct. at 661-663. For example, oral notice would not be sufficient when a contract requires written notice. See id. at 663.

16

on any reasonable view of the evidence, including all rational inferences of which it was susceptible'").

IPI presses a second argument, which is that the judge applied the wrong legal standard in holding that IPI had to provide "unequivocal notice" that it was opting out of the lease extension. In doing so, IPI asks us to rule, contrary to Sourcing Unlimited, that a party seeking to exercise an option not to extend a lease need only convey its intention to its landlord with "reasonable certainty," notwithstanding that the lease specifies requirements for giving notice of the exercise of such an option, and that such requirements were not met.[6]

This argument runs contrary to the elementary principle that an unambiguous contract must be enforced according to its terms, see Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516 (1970), and IPI provides no compelling reason to deviate from this principle. Sourcing Unlimited, and the cases cited therein in which an option was validly exercised without strict compliance with the contract, do not help IPI. Those cases dealt with situations in which the fact of notice was not in

---

[6] We are unpersuaded by IPI's argument that Sourcing Unlimited applied an "unequivocal notice" standard only to explain why summary judgment for the tenant was appropriate in that case, while leaving room for a less demanding "reasonable certainty" standard if proven at trial. For the reasons stated infra, we do not agree that IPI's proffered "reasonable certainty" standard is appropriate in this context.

17

dispute, and the flaw in the exercise of the option was not material. See Sourcing Unlimited, 102 Mass. App. Ct. at 662-663 (notice by e-mail permissible, though lease prohibited such notice, where landlord received "unambiguous written notice of [tenant's] exercise of the option"); Trinity Realty I, LLC v. Chazumba, LLC, 77 Mass. App. Ct. 911, 911-912 (2010) (option to extend lease validly exercised, notwithstanding that lease required tenant to be in full compliance with lease, and tenant breached two lease covenants, where tenant was in substantial compliance with lease); Computune, Inc. v. Tocio, 44 Mass. App. Ct. 489, 493 (1998) (notice to extend lease valid where delivered by Federal Express, rather than certified or registered mail as required by lease); Gerson Realty, Inc. v. Casaly, 2 Mass. App. Ct. 875 (1974) (tenant validly exercised option to renew lease by sending notice of renewal by certified mail, where lease required registered mail). In contrast, where the holder of an option deviates from the terms of the option materially, we have held the exercise of the option invalid. See Cadillac Auto. Co. v. Stout, 20 Mass. App. Ct. 906, 906-907 (1985) (option to purchase invalid where purchaser required to specify date and hour for delivery of deed, and purchaser did not do so; deviation was "not immaterial").

Considering that the gravamen of the option not to extend provision, as stated in Sourcing Unlimited, 102 Mass. App. Ct.

18

at 662, was "to require the party exercising the option to timely inform the other party, in writing, that it is not renewing the lease," IPI's purported notice, which never plainly, clearly, or unequivocally stated that IPI opted not to extend the lease, constituted a material deviation from the notice comprehended by the lease.  IPI's citation to Carey v. Planning Bd. of Revere, 335 Mass. 746, 748 (1957), for the proposition that IPI only needed to provide notice that conveyed IPI's intent not to extend with "reasonable certainty," is inapposite.  The court in Carey made that statement in connection with a statute having to do with appeals from certain municipal boards, G. L. c. 41, § 81BB, which statute provided only that "notice of such appeal" be given to the relevant municipal officer.  See Carey, supra at 746-748; G. L. c. 41, § 81BB, as appearing in St. 1953, c. 674, § 7.  In that context the Carey court stated that the required notice's "form is not important but it must convey with reasonable certainty the information reasonably needed to serve the statutory purpose." Carey, supra at 748.  Nothing in Carey suggests that IPI could materially deviate from unambiguous contractual language requiring the provision of notice in a particular form.[7]  On

_____

[7] The other cases cited by IPI for this proposition do not help IPI's position.  Commissioner of Corps. & Taxation v. Springfield, 321 Mass. 31, 35 (1947), similarly involved statutory notice, and the court's reference to contractual

these facts, the judge did not err in holding that IPI's communications were not sufficient notice. See Cadillac Auto. Co., 20 Mass. App. Ct. at 906-907 (exercise of option invalidated by material deviation).

2. _Liquidated damages_. IPI argues that the judge erred in enforcing the lease's liquidated damages provision and awarding Cummings damages equal to forty-five months of rent. IPI argues that evidence in the record indicated that Cummings needed only six to twelve months to find another tenant. As the Supreme Judicial Court recently stated when upholding a liquidated damages provision in a Cummings lease, "[i]t has long been the rule in Massachusetts that a contract provision that clearly and reasonably establishes liquidated damages should be enforced, so long as it is not so disproportionate to anticipated damages as to constitute a penalty." Cummings Props., LLC v. Hines, 492 Mass. 867, 869-870 (2023) (Hines), quoting TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422, 431 (2006). Accordingly, a party seeking to invalidate a liquidated damages clause must prove either that "(1) damages resulting from a contract breach

---

notice was dicta that did not address contracts requiring notice to be given in a particular form or manner. Seaboard Sur. Co. v. Greenfield, 370 F.3d 215, 220, 223-224 (1st Cir. 2004) involved notice of default, not the exercise of an option, and the contract in that case did not impose requirements as to the manner of notice (other than that notice be written), as opposed to the contract at bar.

20

were easily ascertainable at the time the contract was signed, or (2) the 'damages to which [that party] agreed are disproportionate to a reasonable estimate of those actual damages likely to result from a breach.'"  Hines, supra at 871, quoting Cummings Props., LLC v. National Communications Corp., 449 Mass. 490, 494-495 (2007).

IPI has not met its burden to demonstrate that the liquidated damages clause should be invalidated.  To support its argument that the liquidated damages were disproportionate to a reasonable estimate of the actual damages likely to result from a breach,[8] IPI points to an internal Cummings document that states that, for purposes of the automatic extension provision in Cummings's leases, six to twelve months of notice is "far enough in advance of the termination date so as to afford us the opportunity to find another client."  From this document IPI asks us to infer that the average vacancy in a Cummings property is six to twelve months, impliedly asking us to disregard the judge's finding that the premises at issue sat vacant for three years prior to IPI assuming occupancy.[9]  In any event, the

------

[8] IPI does not argue that the damages were easily ascertainable.

[9] Whether the judge, in concluding that IPI offered "no evidence" of disproportionality, overlooked this document, or instead merely rejected the inference IPI sought to draw from it, is unclear but ultimately immaterial in light of the holding of Hines.

21

Supreme Judicial Court has held that "where, as here, the liquidated damages amount provided for in the lease represents the agreed-on rental value of the property at the time of the breach and decreases during the term of the lease, it is a 'reasonable anticipation of damages that might accrue from the nonpayment of rent.'"  Hines, 492 Mass. at 871-872, quoting NPS, LLC v. Minihane, 451 Mass. 417, 422 (2008).  There was no error in the enforcement of the liquidated damages provision.[10]

                                        Judgment affirmed.

                                        By the Court (Sacks,
                                          Englander & Walsh, JJ.[11]),

                                        Clerk


Entered:  August 13, 2025.

---

[10] As we affirm the judgment, including the assessment of liquidated damages, we need not reach IPI's argument regarding the judge's alternative assessment of holdover damages.

[11] The panelists are listed in order of seniority.

22