# United States Court of Appeals
## For the First Circuit

Nos. 17-1821, 17-1904

IN RE:  PHC, INC. SHAREHOLDER LITIGATION

MAZ PARTNERS LP, on behalf of itself and
all others similarly situated,

Plaintiff, Appellee/Cross-Appellant,

v.

BRUCE A. SHEAR,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Selya and Lynch,
Circuit Judges.

James H. Hulme, with whom Matthew Wright, Nadia A. Patel, Arent Fox LLP, Richard M. Zielinski, Leonard H. Freiman, and Goulston & Storrs, were on brief, for defendant.
Chet B. Waldman, with whom Jeffrey W. Chambers, Patricia I. Avery, Adam J. Blander, Wolf Popper LLP, Norman Berman, Nathaniel L. Orenstein, and Berman Tabacco were on brief, for plaintiff.

July 2, 2018

**SELYA**, <u>**Circuit Judge**</u>.  The briefs in this case read like a law school examination covering a curriculum that ranges from corporate law to the law of equitable remedies.  The questions presented are intricate, entangled, and in some instances novel.  The most important of them implicate Massachusetts law and include whether a non-majority shareholder who also serves as a director can, under certain circumstances, be deemed a controlling shareholder; what effect, if any, shareholder ratification may have with respect to a self-interested transaction; and whether — in the absence of economic loss — equitable disgorgement can be ordered as a remedy for a breach of fiduciary duty.  Concluding, as we do, that the able district judge handled the profusion of issues appropriately, we leave the parties where we found them, affirming both the district court's multi-million-dollar disgorgement order in favor of the plaintiff class and the jury's take-nothing verdict in the favor of the defendant.  The tale follows.

## I. BACKGROUND

We limn the facts and travel of the case, reserving some details for our subsequent discussions of specific issues.  For efficiency's sake, we assume the reader's familiarity with our opinion regarding an earlier phase of this litigation.  See <u>In re PHC, Inc. S'holder Litig.</u> (<u>MAZ I</u>), 762 F.3d 138 (1st Cir. 2014).

- 3 -

Until the fall of 2011, PHC, Inc. (PHC) functioned as a publicly traded corporation focusing on behavioral healthcare. Defendant Bruce A. Shear was a co-founder of PHC, serving as its board chairman and chief executive officer. The company was organized under the laws of Massachusetts, and its capital structure featured two classes of stock: Class A shares and Class B shares. Class A shares were publicly traded and were entitled to one vote per share. Those shares, collectively, had the right to elect two out of six board members. Class B shares were not publicly traded and were entitled to five votes per share. Those shares, collectively, had the right to elect the remaining four board members. At the times relevant hereto, Shear held approximately 8% of the Class A shares and approximately 93% of the Class B shares. Given the proportion of Class B shares owned by Shear, he had the power, practically speaking, to name a majority of the board of directors (four out of six board members).

After PHC's stock price remained relatively flat for a protracted period of time, the PHC board grew restless and began to mull a variety of strategic transactions designed to enhance shareholder equity. To this end, Shear initiated discussions about a possible merger with Acadia Healthcare, Inc. (Acadia) in early 2011. Based on conversations with Shear — who was acting as the de facto lead negotiator on behalf of PHC — Acadia's chief executive officer transmitted a letter of intent, dated March 22,

2011, to the PHC board. The letter delineated the material terms of a proposed merger.

The merger proposal contemplated that Acadia would be the surviving company. PHC shareholders would own 22.5% of the merged entity and Acadia shareholders would own the remainder. To achieve this ratio, holders of both Class A and Class B shares of PHC would receive one-quarter share of the stock of the merged entity in exchange for each PHC share, and the difference between the two classes of PHC stock would evaporate. In order to compensate Class B shareholders for relinquishing their enhanced voting rights, they would receive an additional $5,000,000 as a premium. Shear's ownership of approximately 93% of the Class B shares put him in line to receive most of this premium — roughly $4,700,000.

The letter of intent spelled out a variety of other salient features of the proposed transaction (including Acadia's plan to pay a special dividend to its own shareholders so as to achieve the desired equity split). Under another provision of the letter of intent, Shear would get to select two directors of the merged entity — and those two directors would be the PHC shareholders' sole designees to the new Acadia board. Finally, the letter of intent contained a prohibition against shopping Acadia's offer to other potential merger partners and specified

that a termination fee would be payable if PHC backed out of the merger.

Following receipt of Acadia's letter of intent, Shear asked William Grieco (a PHC director) to serve as the PHC shareholders' principal merger negotiator. Despite naming Grieco as the point man, Shear continued to play a leading role in negotiations. Shear's choice of Grieco was not mere happenstance. The two men had enjoyed a lengthy professional relationship, and Shear had previously named Grieco to the PHC board. Moreover, Shear had arranged that, once the merger was consummated, he and Grieco would be the two PHC designees on the new Acadia board.

As part of his new role as principal negotiator, Grieco assumed responsibility for selecting a financial advisor to analyze the merger and to handle stockholder communications. To that end, the PHC board retained Stout Risius Ross, Inc. (SRR) — a firm that proceeded to evaluate the proposed merger and provide a fairness opinion. SRR reported that the aggregate consideration offered to Class A and Class B shareholders, as a combined group, was fair. Separately, it concluded that the consideration offered to the Class A shareholders was fair. SRR was not asked to analyze (and did not analyze) whether the $5,000,000 Class B premium was fair to the Class A shareholders. The PHC board considered the transaction in light of SRR's truncated fairness opinion and voted — with Shear abstaining — to recommend the proposed merger to PHC's

- 6 -

shareholders.  None of the five directors who voted for this recommendation owned any Class B shares.

On May 23, 2011, Acadia and PHC signed a merger agreement, contingent upon shareholder approval.  In anticipation of a shareholder vote, PHC disseminated a proxy statement chronicling the details of the anticipated merger.  Among other things, the proxy statement disclosed the $5,000,000 premium to be paid to the Class B shareholders, noting that Shear would receive the bulk of that payment.  It also disclosed that the PHC board had opted not to form an independent committee to evaluate the merger proposal.  Finally, it disclosed that Shear and Grieco would serve as directors of Acadia following the merger.  SRR's fairness opinion was distributed to the shareholders along with the proxy statement.

For the merger to be approved, at least a two-thirds majority of Class A shares, a two-thirds majority of Class B shares, and a two-thirds majority of Class A and Class B shares combined had to vote in favor.  On October 26, 2011, PHC shareholders approved the merger:  88.7% of the Class A shares and 99.9% of the Class B shares voted in the affirmative.  MAZ Partners LP (MAZ), the owner of over 100,000 Class A shares, voted its shares against the proposed merger.  On November 1, the merger was consummated, resulting in the conversion of all PHC stock into Acadia stock.  The market reacted favorably to the merger:  Acadia

stock began a long upward climb.  The per-share price of Acadia stock rose from $8 at the time of the merger to over $80 in less than four years.  MAZ did not stay aboard but, rather, sold all of its Acadia stock in January of 2012 (at a profit).

Well before the merger took effect, MAZ repaired to a Massachusetts state court and sued the PHC directors, seeking to block the merger.  Invoking diversity jurisdiction, the defendants removed the action to the federal district court.  See 28 U.S.C. §§ 1332(a), 1441(b).  MAZ was unsuccessful in attempting to halt the transaction:  the district court refused to enjoin the merger.  Nevertheless, MAZ continued to press its breach-of-fiduciary-duty claims, seeking both a remedy at law (money damages) and equitable relief.

In due course, the district court (O'Toole, J.) granted summary judgment in favor of the defendants.  MAZ appealed and succeeded in snatching a partial victory from the jaws of defeat: it persuaded a panel of this court to vacate the summary judgment. See MAZ I, 762 F.3d at 145.  On remand, the case was reassigned to Chief Judge Saris.  See D. Mass. R. 40.1(k).  After some further skirmishing, the district court certified a class of former Class A shareholders who had voted against the merger, abstained from voting, or failed to vote.  MAZ was designated as the class representative and alleged that the PHC directors, jointly and severally, had breached their fiduciary duties by orchestrating

the merger transaction through an unfair process and, of particular pertinence here, by facilitating the payment of the (allegedly inflated) $5,000,000 premium to the Class B shareholders.

The legal claims were tried to a jury (the parties reserving the resolution of the equitable claims). During the course of the trial, the Massachusetts Supreme Judicial Court (SJC) decided International Brotherhood of Electrical Workers Local No. 129 Benefit Fund v. Tucci, 70 N.E.3d 918 (Mass. 2017). Premised on their reading of this decision, the defendants moved for judgment as a matter of law, see Fed. R. Civ. P. 50(a), arguing, inter alia, that MAZ should have brought its claims derivatively. The district court granted this motion in part and entered judgment in favor of all the directors save Shear. As to the latter, the court refused to enter judgment as a matter of law, ruling that there was a jury question as to whether Shear was a controlling shareholder and, thus, came within one of the Tucci exceptions. Accordingly, the court submitted the case to the jury on the legal claims asserted against Shear.

The jury made a series of special findings. See Fed. R. Civ. P. 49. It found, inter alia, that Shear controlled the board's decision to enter into the merger and that the process undertaken to negotiate the merger was not entirely fair to the Class A shareholders. The jury went on to find, though, that the proof was insufficient to establish that the Class A shareholders

- 9 -

had suffered any economic loss.  Predicated on this finding, the jury determined that the plaintiff class was not entitled to money damages and returned a take-nothing verdict.

After the jury returned its verdict, MAZ (on behalf of the plaintiff class) moved for equitable relief.  Specifically, MAZ sought disgorgement of the Class B premium based largely on the jury's findings that Shear was not only a director but also a controlling shareholder, that he therefore owed the shareholders a fiduciary duty, and that he had breached that duty by arranging the merger through a process that was not entirely fair to the Class A shareholders.  Following a hearing, the district court agreed with MAZ, adopted the relevant jury findings, ruled that Shear had breached his fiduciary duty, and determined that the class was entitled to equitable relief.  See MAZ Partners LP v. Shear (MAZ II), 265 F. Supp. 3d 109, 118-21 (D. Mass. 2017).

Concluding that disgorgement was an available and appropriate equitable remedy, the court proceeded to make a series of calculations.  First, it determined that $1,820,000 of the $5,000,000 Class B premium represented fair compensation for the enhanced voting rights carried by the Class B shares.  See id. at 119.  The remainder of the Class B premium ($3,180,000), the court stated, was unjustified.  See id.  Next, the court determined that — based on Shear's percentage ownership of the Class B shares — "Shear's pro rata portion of the unjustified portion of the Class

- 10 -

B premium" was "93.22% of $3.18 million, or $2,964,396."  Id. at 120.  Finally, the court ordered that Shear disgorge this amount, and it awarded those funds to the plaintiff class, together with interest.  See id.

On a parallel track, MAZ challenged the jury verdict and moved for a new trial with respect to the class's legal claims. In support, MAZ contended that the district court had permitted the introduction of unduly prejudicial evidence during the trial. The district court denied this motion.  See id. at 121-22.  These timely appeals ensued:  Shear appeals the disgorgement order, and MAZ appeals the denial of its motion for a new trial.

## II. SHEAR'S APPEAL

Shear attacks the disgorgement order on several fronts. His threshold argument is that MAZ's suit is infirm because it should have been brought derivatively, not directly.  Next, he argues that the district court applied the wrong standards in adjudicating MAZ's claim.  Finally, he argues that the disgorgement order was beyond the district court's authority and, even if it was not, comprised an abuse of discretion.  We deal with these arguments sequentially.[1]

---

[1] Shear has taken a blunderbuss approach and proffered a host of other arguments.  We have considered these other arguments, but reject them out of hand as patently meritless, insufficiently developed, or both.

## A. **Direct and Derivative Actions.**

The first skirmish centers on Shear's asseveration that this suit should have been brought derivatively, not directly. The distinction is critically important:  shareholders can bring a direct claim for their own benefit, but a derivative claim belongs to the corporation.  See Tucci, 70 N.E.3d at 923.  This distinction holds even though the law "permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties'" in the form of a derivative action.  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991) (emphasis omitted) (quoting Ross v. Bernhard, 396 U.S. 531, 534 (1970)).  Derivative suits are subject to special procedural guardrails designed to balance the legitimate exercise of business judgment by corporate decisionmakers, on the one hand, with the oversight function of corporate shareholders, on the other hand.  A claim that is brought directly when it should have been brought derivatively is not a claim at all and, hence, is subject to dismissal.  See Tucci, 70 N.E.3d at 927.

In diversity jurisdiction, state law supplies the substantive rules of decision.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Questions of corporate law — including whether a claim is properly classified as derivative or direct — are generally substantive and, thus, governed by state law.  See Gasperini v. Ctr. for Humanities, 518 U.S. 415, 427 (1996); Kamen,

500 U.S. at 99.  Consistent with PHC's status as a Massachusetts corporation, the parties agree that Massachusetts law controls in this case.

The starting point for our inquiry is, of course, Tucci. There, the SJC clearly articulated, for the first time, the framework for determining which causes of action must be brought derivatively and which can be brought directly.[2]  The crux of the inquiry is "whether the harm [that shareholders] claim to have suffered resulted from a breach of duty owed directly to them, or whether the harm claimed was derivative of a breach of duty owed to the corporation."  Tucci, 70 N.E.3d at 923.  Because a director's fiduciary duties are generally owed only to the corporation, any suit to enforce those duties ordinarily must be brought as a derivative action.  See id. at 925-27.

We say "ordinarily" because the Tucci court identified at least two situations in which a director's fiduciary duties are owed to shareholders and can be enforced directly, rather than derivatively.  The first of these exceptions involves close corporations, see id. at 926, and is plainly inapposite (PHC stock, after all, was publicly traded, and PHC can by no stretch of even the most lively imagination be considered a close corporation).

---

[2] MAZ argues that Tucci does not apply since the injury it alleges is unique to a particular class of shareholders.  We do not reach this argument because — as we explain below — MAZ prevails on a less exotic ground.

The second exception hits closer to home: it involves situations in which a "controlling shareholder who also is a director proposes and implements a self-interested transaction that is to the detriment of minority shareholders." Id. The case at hand requires us to explore the parameters of this exception and decide whether Shear fits within it.

To begin, Shear does not contest the self-interested nature of the corporate transaction that gave rise to the Class B premium. Nor can he gainsay that the jury made a special finding of detriment: the merger was not entirely fair to the Class A shareholders. The question, then, reduces to whether the district court supportably determined that Shear possessed a sufficient degree of control to be considered a controlling shareholder.[3]

Answering this question requires us to delve into matters of first impression: Tucci did not elaborate on the attributes that are necessary to distinguish a controlling shareholder from a non-controlling shareholder. Faced with terra incognito, we must "endeavor to predict how [the state's highest] court would likely decide the question." Butler v. Balolia, 736 F.3d 609, 612-13 (1st Cir. 2013). We are mindful that, when making such an informed prophecy, "[a] federal court should consult the

---

[3] Unless otherwise specifically indicated or when describing Delaware cases, we use the term "controlling shareholder" throughout this opinion to mean a controlling shareholder who is also a director.

types of sources that the state's highest court would be apt to consult, including analogous opinions of that court, decisions of lower courts in the state, precedents and trends in other jurisdictions, learned treatises, and considerations of sound public policy." Id. at 613.

At the outset, we reject out of hand Shear's insistence upon a bright-line rule that only majority shareholders can be controlling shareholders under Massachusetts law. He offers little to support such a proposition. And while Shear is correct that the SJC sometimes uses terminology reminiscent of the majority shareholder/minority shareholder dichotomy, it has done so only in the abstract or in cases in which those terms accurately describe the relationship between the relevant parties. See, e.g., Tucci, 70 N.E.3d at 923-27; Coggins v. New England Patriots Football Club, Inc., 492 N.E.2d 1112, 1119 (Mass. 1986). The SJC has given no meaningful indication that the employment of such language was meant to be a guiding principle for determining "controller" status in the mine-run of future cases.

A contrary hypothesis is more compelling. The SJC's use of the adjective "controlling" to modify "shareholder" strongly suggests a desire to encompass a category of shareholders broader than majority shareholders. If "controlling shareholder" meant no more than "majority shareholder," there would be no reason at all for the SJC to resort to the "controlling shareholder" parlance.

Cf. United States v. Thomas, 429 F.3d 282, 286 (D.C. Cir. 2005) (explaining that a court's obvious choice to use one phrase over another in authoring a decision should be given interpretive weight in applying that decision).

Another clue points in the same direction. Although the SJC has not opined as to who might qualify as a controlling non-majority shareholder, it has expressed a concern for the protection of minority shareholders when a director "is dominating in influence or in character." Coggins, 492 N.E.2d at 1118 (quoting Lazenby v. Henderson, 135 N.E. 302, 304 (Mass. 1922)). Such a concern would not be palliated by restricting controlling shareholder status to majority shareholders.

The sockdolager, we think, is that Massachusetts courts often look to Delaware law in analyzing corporate issues. See, e.g., Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund, 995 N.E.2d 64, 72 (Mass. 2013); Billings v. GTFM, LLC, 867 N.E.2d 714, 722 & n.24 (Mass. 2007); Piemonte v. New Bos. Garden Corp., 387 N.E.2d 1145, 1150 (Mass. 1979). Delaware law has long been hospitable to interpretations of the term "controlling shareholder" that include non-majority shareholders. In what is generally regarded as a landmark case in the area of corporate governance, the Delaware Supreme Court recognized that although a non-majority shareholder usually will not be deemed a controlling shareholder, there are exceptions.

- 16 -

See Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110, 1114 (Del. 1994). Such a status can be established by showing, say, "domination [of the corporation] by a minority shareholder through actual control of corporat[e] conduct." Id. (quoting Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 70 (Del. 1989)); see Weinstein Enters., Inc. v. Orloff, 870 A.2d 499, 507 (Del. 2005). Ultimately, "the analysis of whether a controlling stockholder exists must take into account whether the stockholder, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes." In re Cysive, Inc. S'holders Litig., 836 A.2d 531, 553 (Del. Ch. 2003). We conclude that the SJC would follow such a rule and would hold that a non-majority shareholder who dominates a corporation through actual control of corporate conduct may be deemed a controlling shareholder. Cf. Butler, 736 F.3d at 612-13 (explaining that "precedents and trends in other jurisdictions" appropriately may be consulted in determining what a state's highest court might rule).

This gets the grease from the goose. The record contains ample evidence to ground the conclusion that Shear dominated PHC and had pervasive control over its affairs. As the co-founder, board chairman, and chief executive officer, Shear was a ubiquitous force within the company. Indeed, PHC itself acknowledged his control in filings submitted to the Securities and Exchange

- 17 -

Commission (SEC). For example, in a 2011 filing, PHC stated (under the heading "Management Risks") that "Bruce A. Shear is in control of the Company . . . . [He] can establish, maintain and control business policy and decisions by virtue of his control of the election of the majority of the members of the board of directors." Such representations are entitled to weight in determining whether an individual is a controlling shareholder. See In re Primedia Inc. Derivative Litig., 910 A.2d 248, 258 (Del. Ch. 2006).

While the percentage of the corporate stock that an individual owns is surely a relevant integer in the calculus of control, a party who dominates a corporation and has actual control over it should not be allowed to hide behind mere arithmetic. Shear, however, would have us place more weight on raw numbers. He implores us to accord decretory significance to ownership percentages, pointing out that his stock accounted for only 20% or so of the overall voting power. But this is too myopic a view: there is no formulaic rule regarding what percentage of outstanding shares is sufficient to render a shareholder "controlling." Moreover, the case law is hostile to Shear's absolutist position. For instance, Delaware courts have found minority shareholders to be controlling shareholders under particular circumstances. See, e.g., In re Cysive, 836 A.2d at 535, 553.

In the end, everything depends on context. Here, the numerical fraction of PHC's voting power conferred by Shear's

shares — hardly an insubstantial portion — does not fairly reflect salient facts regarding his domination of the company and his formidable ability to steer fundamental corporate decisions. Control has a distinctly practical dimension and, as a practical matter, Shear had control of PHC.

For one thing, Shear's near-complete ownership of, and concomitant voting control over, the Class B stock guaranteed him the power to veto corporate decisions that were not to his liking. The power to block certain corporate paths by veto is the power to direct the corporation to take the route preferred by the veto-wielder. As any motorist knows, when access is denied to road after road, a driver has little choice but to follow the detour signs. The existence of this power, then, is a telltale sign that Shear had significant control over PHC's affairs.

For another thing, Shear had the power to name four of the six directors (a majority of the board). Courts often have found that the power to appoint a substantial portion of the board is a meaningful indicium of control. See, e.g., Lynch, 638 A.2d at 1112-13; see also In re Primedia, 910 A.2d at 258 (finding number of directors appointed by allegedly controlling shareholder relevant to "control" inquiry).

In addition, "control over the particular transaction at issue" may be sufficient to establish controller status for fiduciary-duty purposes. In re Primedia, 910 A.2d at 257. Shear

had such control: he was the primary negotiator of the material terms of the PHC-Acadia merger; he remained a leading player in the negotiations even after Acadia's letter of intent was transmitted and he arranged for his ally, Grieco, to be designated (at least nominally) as PHC's principal negotiator; and his suzerainty over the Class B shares allowed him to dictate board voting and to scuttle any merger that was not to his taste. To cinch the matter, the jury found that "Shear controlled a majority of the PHC Board of Directors with regard to the Board's decision to approve the merger." That finding is amply supported by the evidence, and we — like the court below — have no reason to disregard it. See Jones ex rel. U.S. v. Mass. Gen. Hosp., 780 F.3d 479, 487 (1st Cir. 2015); Ira Green, Inc. v. Military Sales & Serv. Co., 775 F.3d 12, 18 (1st Cir. 2014).

Shear tries twice over to throw sand in the gears of this reasoning. Both attempts hark back to Tucci. First, he argues that his control over PHC was less than that of the defendant in Tucci. This argument, though, is smoke and mirrors: the defendant in Tucci was not sued as a controlling shareholder, see 70 N.E.3d at 923-27, and the SJC had no earthly reason to determine whether he qualified as such.

Shear's second sortie fares no better. He notes that the Tucci court spoke of a controlling shareholder's power to "propose[] and implement[]" transactions, id. at 926, and says

- 20 -

that, by himself, he could not have implemented the merger — he needed the votes of the Class A shareholders. On its own terms, this argument is problematic. The Tucci court gave no hint that by using the word "implement," it meant "unilaterally implement." In all events, such an interpretation would be overly rigid because, among other things, it does not account for the degree of a fiduciary's pervasive influence within the company.

That ends this aspect of the matter. As we have indicated, control is a practical concept. It is derived from a combination of elements. See In re Cysive, 836 A.2d at 553. Taken in the aggregate, the combination of elements in this case easily supports the district court's determination that Shear dominated PHC and had actual control over its affairs (including the merger transaction). Accordingly, the district court did not err in holding that Shear — as the jury had found — was a controlling shareholder within the Tucci taxonomy. It follows inexorably, as night follows day, that MAZ's suit was appropriately brought as a direct suit against Shear. See Tucci, 70 N.E.3d at 926.

## B. **Fairness**.

Having found that Shear was a controlling shareholder, the district court proceeded to determine that he had breached his fiduciary duty to the Class A shareholders. See MAZ II, 265 F. Supp. 3d at 118-19. In making this determination, the court adopted a finding by the jury: that the process through which

Shear had arranged the merger (and, in particular, the payment of the Class B premium) was not "entirely fair" to the Class A shareholders.  Shear challenges both the applicability of the "fairness" standard and the court's allocation of the burden of proof on this issue.

We turn first to Shear's argument that the district court painted with too broad a brush in instructing the jury to apply the "fairness" standard and then turn to his argument that, in all events, the plaintiff class should have borne the burden of proof with respect to fairness.  Since both of Shear's arguments center on abstract questions of law, our review is de novo.  See San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 29 (1st Cir. 2010); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 158 (1st Cir. 2004).

**1.  Scope of the Inquiry**.  Endorsing Delaware's conception of fairness as "closely related to the views expressed in [Massachusetts] decisions," the SJC has explained that "where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."  Coggins, 492 N.E.2d at 1117 (quoting Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983)).[4]

---

[4] The SJC has made plain its view that fairness extends beyond a simple finding of fair price.  See Coggins, 492 N.E.2d at 1117, 1119 (explaining that fairness inquiry involves examination of totality of circumstances, and noting that Delaware's fairness

Coggins thus makes pellucid that fairness is an essential element in judicial examination of intra-corporate claims involving self-dealing.[5]  See id. at 1117-19; see also Bos. Children's Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429, 433 (1st Cir. 1996) (applying Massachusetts law and explaining that "fairness" standard applies to fiduciary's ability to set own salary); Geller v. Allied-Lyons PLC, 674 N.E.2d 1334, 1338 n.8 (Mass. App. Ct. 1997) (explaining that "fairness" standard applies to contract promising fiduciary finder's fee).

Shear argues that in this instance the fairness standard was misplaced because the majority of Class A shareholders voted to approve the transaction.  He argues, in the alternative, that even if some judicial review was warranted, the court should have narrowed its aperture and reviewed the alleged breach not under the "fairness" standard but, rather, under the highly deferential "business judgment" rule.  In support of both of these arguments,

_____

inquiry, encompassing "fair dealing and fair price," is compatible with Massachusetts' inquiry (quoting Weinberger, 457 A.2d at 711)).

[5] In Houle v. Low, 556 N.E.2d 51 (Mass. 1990), the SJC discussed a standard that did not require a reviewing court to examine fairness.  See id. at 59.  That more generous standard only applies, though, when an independent committee has decided not to pursue derivative breach-of-fiduciary-duty claims.  See id.  Even then, the altered standard might not be satisfied if the contested action allowed a "defendant who has control of the corporation to retain a significant improper benefit."  Id.  This case is far removed from any set of facts that might bring the Houle standard into play.

he points to section 8.31 of the Massachusetts Business Corporation Act (the Act).  See Mass. Gen. Laws ch. 156D, § 8.31.  That statute, though, simply will not bear the weight that Shear loads upon it.

In relevant part, section 8.31 states that a "conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if . . . the material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction."  Id. § 8.31(a)(2).  Assuming, favorably to Shear, that the merger transaction at issue here is a "conflict of interest" transaction within the purview of section 8.31(a)(2) — a matter on which we take no view — the statute says what it means and means what it says:  it simply protects such a transaction from voidability. See id. § 8.31 cmt. 1 ("Section 8.31(a) makes any automatic rule of voidability inapplicable to transactions that are fair or that have been approved by directors or shareholders in the manner provided by the balance of § 8.31.").

Critically, section 8.31 is silent as to director liability.  This silence is especially telling when section 8.31 is juxtaposed with the immediately preceding section of the Act — section 8.30.  In contrast to section 8.31, section 8.30 is explicit about the circumstances in which a director will be shielded from liability.  See id. § 8.30(c) ("A director is not

liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.").  When a legislature offers protection to a party under one section of a statute but declines to offer the party the same protection under a closely related section, it is usually fair to presume that the legislature did not intend to afford such protection under the latter section.  See Duncan v. Walker, 533 U.S. 167, 173 (2001) ("It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  (internal quotation marks and alteration omitted)); Citizens Awareness Network, Inc. v. United States, 391 F.3d 338, 346 (1st Cir. 2004) (stating that the "use of differential language in various sections of the same statute is presumed to be intentional and deserves interpretive weight").  So it is here.

Viewed against this backdrop, section 8.31 offers Shear little shelter.  Fairly read, the statute sets up shareholder ratification as a potential protection against the voidability of a transaction, but it does not give a controlling shareholder a free pass for a breach of his fiduciary duty qua director.  We hold, without serious question, that section 8.31 does not afford a conflicted director a safe harbor for a breach of his fiduciary

- 25 -

duty.  See Mass. Gen. Laws ch. 156D, § 8.31 cmt. 1 ("A director who engages in a transaction with the corporation that is not voidable . . . is not thereby automatically protected against a claim of impropriety on his part.").

If more were needed — and we doubt that it is — section 8.31 offers no support for the notion that the Massachusetts legislature sought to dislodge the "vigorous" level of judicial oversight available for breach-of-fiduciary-duty claims against conflicted directors.  Coggins, 492 N.E.2d at 1117.  Section 8.31 was enacted in 2003 — at a time when Massachusetts common law concerning self-interested fiduciaries was well-developed, and it is a familiar tenet that when a statute addresses issues previously governed by common law, an inquiring court should presume that — except where explicit changes are made — the legislature intended to retain the substance of preexisting law.  See Kirtsaeng v. John Wiley & Sons, Inc., 568 U.S. 519, 538 (2013).  Shear has identified no principled basis for refusing to honor this presumption here.[6]

---

[6] The only Massachusetts cases in which shareholder ratification appears to have been given a cleansing effect involve close corporations.  See Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 182 (Mass. 1997); see also In re Mi-Lor Corp., 348 F.3d 294, 304 (1st Cir. 2003) (applying Massachusetts law).  Such cases have no bearing here:  shareholders in close corporations have materially different rights and responsibilities than do shareholders in public corporations.  See In re Mi-Lor Corp., 348 F.3d at 305.

As a fallback, Shear invites us to follow a trail blazed by the Delaware courts, which under certain circumstances require less searching judicial scrutiny of transactions that have been ratified by shareholders. See, e.g., Singh v. Attenborough, 137 A.3d 151, 151 (Del. 2016); Corwin v. KKR Fin. Holdings LLC, 125 A.3d 304, 309 n.19 (Del. 2015). We conclude, though, that this line of cases does not aid Shear's cause. Hence, we decline his invitation. Even under the Delaware cases, shareholder ratification does not change the scope of judicial review in the context of conflicted transactions engaged in by a controlling fiduciary. See In re JCC Holding Co., 843 A.2d 713, 723-24 (Del. Ch. 2003). This limitation makes eminently good sense inasmuch as the coercion inherent in the relationship between a controlling shareholder and the remaining shareholders "undermine[s] the fairness-guaranteeing effect of a majority-of-the-minority vote condition because coerced fear or a hopeless acceptance of a dominant power's will, rather than rational self-interest, is deemed likely to be the animating force behind the minority's decision to approve the merger." Id. at 723. We are confident that the SJC would hue to this limitation and retain the fairness standard for self-interested transactions even in the face of shareholder ratification.

To say more on this point would be supererogatory. Given the self-interested nature of the challenged transaction, we hold

that the district court did not err in subjecting the transaction to the "fairness" inquiry elucidated in Coggins and its progeny.

**2. Burden-Shifting.** Having concluded that the district court properly framed the inquiry in terms of the fairness of the challenged transaction, we turn to Shear's remonstrance that the court erred in assigning him the burden of proof. We start with the general rule that, in Massachusetts, "[a] controlling stockholder who is also a director standing on both sides of the transaction bears the burden of showing that the transaction does not violate fiduciary obligations." Coggins, 492 N.E.2d at 1118; see Geller, 674 N.E.2d at 1338 n.8. Policy considerations buttress this allocation of the burden of proof. See Coggins, 492 N.E.2d at 1118 (noting concern for protection of minority shareholders in presence of controlling fiduciary). At first blush, then, the district court would appear to have been on solid footing in holding that Shear — as a controlling shareholder and self-interested director — bore the burden of proving that the process underlying the merger transaction was fair to the Class A shareholders.

Despite this general rule, Shear contends that the burden of proof should have been shifted to the plaintiff class. In advancing this contention, he asks us to break new ground: the SJC has never addressed what circumstances, if any, might justify shifting the burden from a conflicted fiduciary to complaining

shareholders. Shear urges us to hold that shareholder ratification is one such circumstance.

Shear's attempt to give a cleansing effect to shareholder ratification relies in large part on the commentary to section 8.31 of the Act. See Mass. Gen. Laws ch. 156D, § 8.31 cmt. 2 (stating that shareholder ratification may shift the burden of proof to the complaining party with respect to "any challenge to the acts for which the requisite vote was obtained"). His reliance is mislaid. As we already have explained, see supra Part II(B)(1), the animating purpose of section 8.31 is to curtail the common law rule making conflicted transactions automatically voidable. See Mass. Gen. Laws ch. 156D, § 8.31 cmt. 1. There is no issue of voidability in this case and, thus, the commentary upon which Shear relies does not breathe life into his novel contention.

Shear has another shot in his sling. He points to Delaware case law suggesting that certain facts, such as full disclosure to disinterested shareholders who subsequently ratify a transaction, may sometimes justify shifting the burden to the plaintiff to prove that a transaction is unfair. See, e.g., Ams. Mining Corp. v. Theriault, 51 A.3d 1213, 1242 (Del. 2012). This case law simply does not fit. Even in Delaware, such burden-shifting occurs only when a pretrial determination regarding the crucial facts can be made. See id. at 1243 (holding that "if the

record does not permit a pretrial determination that the defendants are entitled to a burden shift, the burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction"). No such pretrial determination was possible here: the evidence was inconclusive as to whether the Class A shareholders, prior to ratification, had been sufficiently informed of the material facts of the transaction.

We do not think that the SJC would depart from its settled rule and shift the burden of proof on these facts. No precedent compels (or even strongly suggests) such a result. Massachusetts law has long imposed the burden of proving entire fairness on a director accused of self-dealing, see Coggins, 492 N.E.2d at 1117-18, and this rule has special salience where, as here, a case involves a controlling shareholder who is dominating in influence, see id. Viewed through this prism, we conclude that the Class A shareholders' approval of the merger package did not constitute the sort of fully informed ratification that might cleanse the transaction of the stench of self-dealing so as to warrant a shifted burden.

## C. Disgorgement.

Shear next complains that the district court erred in ordering disgorgement of so much of the Class B premium as exceeded what would have been a fair premium for the Class B shares.

Disgorgement is an equitable remedy, and we review the award of an equitable remedy "under a bifurcated standard." State St. Bank & Tr. Co. v. Denman Tire Corp., 240 F.3d 83, 88 (1st Cir. 2001). The availability of an equitable remedy presents a question of law engendering de novo review, while the decision either to award or to refrain from awarding an available equitable remedy is reviewed for abuse of discretion. See id. Shear's plaint implicates both prongs of this bifurcated standard.

      **1.   Availability.** To begin, Shear asserts that disgorgement was not an equitable remedy available to MAZ. In support, he offers a hodge-podge of theories, all of which draw their essence from a fundamental misunderstanding of breach-of-fiduciary-duty claims: he insists that such claims are essentially legal, not equitable. Shear is wrong.

      A claim for breach of fiduciary duty is a claim originating in equity. See In re Evangelist, 760 F.2d 27, 29 (1st Cir. 1985) (Breyer, J.) ("Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in equity' — carrying with them no right to trial by jury."); see also Coggins, 492 N.E.2d at 1117 ("The court is justified in exercising its equitable power when a violation of fiduciary duty is claimed."). For decades, Massachusetts courts have recognized that equity empowers them to examine putative breaches of fiduciary duty, particularly when evidence of self-dealing exists. See, e.g.,

Coggins, 492 N.E.2d at 1117; Winchell v. Plywood Corp., 85 N.E.2d 313, 316-17 (Mass. 1949); Sagalyn v. Meekins, Packard & Wheat, Inc., 195 N.E. 769, 771 (Mass. 1935). If a breach of fiduciary duty is found, equity allows the court to order appropriate equitable relief. See Allison v. Eriksson, 98 N.E.3d 143, 154 (Mass. 2018); Demoulas v. Demoulas, 703 N.E.2d 1149, 1169 (Mass. 1998). This remains true even when a remedy at law is also available. See Cosmopolitan Tr. Co. v. Mitchell, 136 N.E. 403, 409 (Mass. 1922); see also Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 178 n.32 (Mass. 1997) (explaining that even though breach of fiduciary duty can, under certain circumstances, form the basis for an action at law for money damages, it generally forms the basis for an equitable cause of action).

The hallmark of equitable relief is its protean nature and — within wide limits — a court sitting in equity may tailor relief to fit the circumstances of a particular case. See Allison, 98 N.E.3d at 154; Demoulas, 703 N.E.2d at 1169. Within this remedial realm, it is standard fare for a court to fashion remedies that deny a breaching fiduciary undue gain or advantage received by virtue of his position. See Chelsea Indus., Inc. v. Gaffney, 449 N.E.2d 320, 327 (Mass. 1983); Sagalyn, 195 N.E. at 771; Geller, 674 N.E.2d at 1337; see also Haseotes v. Cumberland Farms, Inc. (In re Cumberland Farms, Inc.), 284 F.3d 216, 229 (1st Cir. 2002) (applying Massachusetts law).

Examples abound and we invoke one to illustrate this point. In Sagalyn, the SJC considered a series of votes by directors who were also corporate officers, which had the effect of raising salaries for one another. See 195 N.E. at 771. Finding that the directors had breached their fiduciary duty, the court upheld a decree directing that each of them must refund to the corporation "the excess of salary [received as a result of the vote] beyond the fair value of his services" as determined by a special master. Id. at 771-72. The court explained that fiduciaries have a "responsibility to refrain from taking an undue advantage of the corporation" and that a breach of fiduciary duty may lie "even in the absence of moral turpitude." Id. at 771.

Viewed against this backdrop, Shear's claim that disgorgement was not an available remedy goes up in smoke. His most loudly bruited argument — that a claim of breach of fiduciary duty requires a showing of damages — runs headlong into a wall of precedent. The case law holds with conspicuous clarity that when a fiduciary has secured an undue advantage by virtue of his position, equitable relief is available even in the absence of direct economic loss to the complaining party.[7] See Chelsea

_____

[7] Groping for support, Shear directs us to a few cases that list "damages" as an "element" of a claim for breach of fiduciary duty. See, e.g., Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005); Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 288 (Mass. App. Ct. 1999). Once again, Shear fails to appreciate that breach-of-fiduciary-duty claims can have both

- 33 -

Indus., 449 N.E.2d at 327; Sagalyn, 195 N.E. at 771; see also In re Cumberland Farms, 284 F.3d at 229.

The Massachusetts decisions align comfortably with decisions elsewhere. The better-reasoned view is that harm is required "only for [the legal remedy of] damages, not for the equitable remedy of disgorgement." Huber v. Taylor, 469 F.3d 67, 77 (3d Cir. 2006). Embracing this principle, the D.C. Circuit has explained that the equitable remedy of forfeiture does not require a showing of injury to a victim because forfeiture is aimed at "deter[ing] . . . misconduct, a goal worth furthering regardless of whether a particular [person] has been harmed. It also fulfills a longstanding and fundamental principle of equity — that fiduciaries should not profit from their disloyalty." Hendry v. Pelland, 73 F.3d 397, 402 (D.C. Cir. 1996) (internal citations omitted). This reasoning applies four-square to the circumstances at hand. Requiring a controlling shareholder who had breached his fiduciary duty to disgorge the fruits of his misconduct serves a

---

legal and equitable dimensions. In the bargain, he ignores the SJC's repeated affirmation that equitable relief can be provided for such claims. See, e.g., Allison, 98 N.E.3d at 154; Chelsea Indus., 449 N.E.2d at 327.

Billings, cited hopefully by Shear, is not to the contrary. 867 N.E.2d 714. The language to which Shear adverts is from the court's recitation of the case's procedural history, see id. at 719, and Billings never considered whether equitable relief could have been available absent a showing of economic harm.

valid societal purpose regardless of whether the innocent shareholders have been injured by his misconduct.

Relatedly, Shear argues that disgorgement is an inappropriate remedy for a breach of fiduciary duty and that its availability should be limited to claims for unjust enrichment. This is much too crabbed a view.

A breach of fiduciary duty is historically an equitable claim, see In re Evangelist, 760 F.2d at 29, and a court faced with such a breach has the authority to choose an appropriate remedy from the wide armamentarium of equitable remedies, see Demoulas, 703 N.E.2d at 1169. Ordering a fiduciary to relinquish the undue advantage obtained through a breach of his fiduciary duty is an unremarkable exercise of this authority. See Chelsea Indus., 449 N.E.2d at 327; Sagalyn, 195 N.E. at 771; see also Bos. Children's Heart Found., 73 F.3d at 433.

Shifting gears, Shear argues that the jury's verdict — specifically, the jury's finding that the plaintiff class suffered no economic loss — foreclosed any equitable remedy. He frames this argument in terms of the Seventh Amendment, which he says forbids a district court from applying equitable doctrines that depend to any degree on factual predicates previously rejected by a jury verdict. We believe that Shear is trying to fit a square peg into a round hole.

In the proceedings below, MAZ sought both legal and equitable relief. The district court tried the legal claims to a jury and reserved ruling on the equitable claims. This bifurcation was not only agreed to by the parties but also tracked generally accepted procedures: when a single issue may be viewed as either legal or equitable (depending upon what relief is forthcoming), the issue should first be tried to a jury even though the court, taking into account the jury's findings, may later have to determine whether to grant equitable relief. See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 479 (1962); Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 677 (1st Cir. 1992); see also 9 Charles Alan Wright et al., Federal Practice and Procedure § 2306 (3d ed. 2018).

To support his position that disgorgement is unavailable once a jury has found no damages, Shear pins his hopes to the decision in National Railroad Passenger Corp. v. Veolia Transportation Services, Inc., 886 F. Supp. 2d 14 (D.D.C. 2012). But there, the court found "[n]o shattered fiduciary relationship between [the parties that] require[d] the court's protection." Id. at 19. Such a finding distinguishes Veolia from this case — a differentiating circumstance that is made luminously clear by the Veolia court's careful distinguishing of cases permitting disgorgement. See id. at 18-19.

We add, moreover, that the district court's disgorgement order was not at odds with the jury's verdict. Contrary to Shear's

- 36 -

importunings, the disgorgement order did not contradict the jury's finding that the plaintiff class had sustained no economic loss. Rather, the court accepted that finding and relied on the jury's other findings — particularly its findings that Shear was a controlling shareholder and that the process leading up to the merger had not been entirely fair — to form an acceptable predicate for equitable relief. See MAZ II, 265 F. Supp. 3d at 119. This process accorded with the procedure endorsed by the SJC. See Demoulas, 703 N.E.2d at 1172-73 (upholding order for equitable relief when jury had made determinations regarding wrongdoing).

The Seventh Amendment figures into Shear's asseverational array in yet another way. He urges us to find that the disgorgement order is an unconstitutional additur. Here, too, Shear is foraging in an empty cupboard.

The prohibition against unconstitutional additurs is rooted in the Seventh Amendment's guaranty of the right to trial by jury. See Dimick v. Schiedt, 293 U.S. 474, 485 (1935). As such, the prohibition only applies to jury awards on legal claims. See Haskins v. City of Boaz, 822 F.2d 1014, 1015 (11th Cir. 1987) (per curiam). It follows inexorably that the Seventh Amendment has no application to an equitable remedy (such as a dollars-and-cents disgorgement order) issued to remediate an equitable violation. See id.

That ends this aspect of the matter.  Exercising de novo review, we conclude that, in the circumstances of this case, the equitable remedy of disgorgement was available in principle.

**2. Appropriateness**.  Our holding that disgorgement was an available remedy does not speak to whether the district court's crafting of the disgorgement order was an appropriate exercise of its discretion.  We turn next to that question.

The baseline premise is that "[e]quitable remedies are flexible tools to be applied with the focus on fairness and justice."  Demoulas, 703 N.E.2d at 1169.  Acting in accordance with this premise, the district court purposed to fashion a two-step disgorgement order.  First, the order stripped Shear of the unfair advantage — his share of the inflated portion of the Class B premium — gained through his breach of fiduciary duty.  Second, the order redistributed those gains to the plaintiff class.  The court's methodology is not in issue.  Based on comparable transactions, the court identified the portion of the $5,000,000 Class B premium that represented fair compensation for the enhanced voting rights carried by the Class B shares ($1,820,000).  The remainder of the Class B premium ($3,180,000), the court found, was unjustified.  Based on Shear's percentage ownership of the Class B shares, the court calculated that Shear had received $2,964,396 in unjustified compensation.  The court ordered that

Shear disgorge this amount and, at the same time, awarded those funds to the plaintiff class, together with interest.

Chaffing under this regime, Shear asseverates that disgorgement, even if theoretically available, was wholly inappropriate in this instance and, thus, an abuse of discretion. We reject this asseveration and conclude that, in the circumstances at hand, the disgorgement order was well within the compass of the district court's discretion.

We need not tarry. Given Shear's breach of fiduciary duty, forcing him to disgorge the fruits of his inequitable behavior seems an altogether fitting remedy. Indeed, when a conflicted fiduciary gains an unfair advantage through a breach of his fiduciary duty, it is hard to imagine equitable relief more appropriate than an order compelling him to disgorge the fruits of his breach. It is, therefore, unsurprising that the SJC has approved the use of disgorgement as a remedy in highly analogous circumstances. See Sagalyn, 195 N.E. at 771 (upholding order that fiduciaries refund portion of compensation in excess of fair value as determined by special master).

Shear's rejoinder is unavailing. He says that the plaintiff class sustained no loss and, accordingly, did not need disgorgement in order to be made whole. That is true as far as it goes — but it does not take Shear very far. The district court dealt effectively with this argument. It acknowledged that the

disgorgement order resulted in something of a windfall for the plaintiff class and that such windfalls should generally be avoided. See MAZ II, 265 F. Supp. 3d at 120. Refusing to order disgorgement, though, would have resulted in a windfall to Shear. See id. Faced with this quandary, the court reasonably determined that it was more equitable that any windfall accrue to the plaintiff class rather than to the self-dealing fiduciary. See id. at 120-21.

We think that this choice was a supportable exercise of the district court's broad discretion. If a windfall is in prospect, time-honored principles of equity favor bestowing the windfall upon the wronged party as opposed to allowing the wrongdoer to retain it. See Lawton v. Nyman, 327 F.3d 30, 45 (1st Cir. 2003) (explaining that it is "more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them" (quoting Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965))); cf. Law v. Griffith, 930 N.E.2d 126, 132 (Mass. 2010) (stating that, under collateral source rule, "avoiding a windfall to a tortfeasor is preferable even if a plaintiff thereby receives an excessive recovery in some circumstances").

Shear's citation to Brodie v. Jordan, 857 N.E.2d 1076 (Mass. 2006), for the proposition that a "remedy should neither grant the minority a windfall nor excessively penalize the

- 40 -

majority" does not undermine this conclusion. Id. at 1080. Brodie is inapposite: that case did not involve the disgorgement of a financial benefit improperly gained by a fiduciary through his position.

The short of it is that the disgorgement order was comfortably within the district court's authority and was suitably tailored to redress Shear's inequitable conduct. Consequently, we find the disgorgement order to be an appropriate exercise of the district court's discretion.

## D. **Recapitulation**.

To recapitulate, we conclude that this suit was appropriately brought directly against Shear as a "controlling shareholder who also is a director." Tucci, 70 N.E.3d at 926. Given Shear's controller status, the district court correctly applied the fairness standard to his course of conduct and quite properly allocated the burden of proving fairness to him. After a supportable finding of breach of fiduciary duty, disgorgement was well within the wide armamentarium of equitable remedies available to the district court. Last but not least, we conclude that the district court did not abuse its discretion in crafting a disgorgement order designed to ensure that Shear would not be allowed to enjoy the fruits of his breach.

## III. MAZ'S APPEAL

There is one last leg to our journey. MAZ appeals the district court's denial of its motion for a new trial. In support, MAZ submits that the district court abused its discretion in allowing Shear, during the jury-trial phase of the case, to introduce evidence of Acadia's "more than ten-fold" increase in its stock price post-merger (over the course of nearly four years). MAZ objected to the stock-price evidence below, and this claim of error is preserved for purposes of appeal.

Where, as here, the denial of a motion for new trial hinges on a preserved challenge to an evidentiary ruling, we review the underlying evidentiary ruling for abuse of discretion. See Ira Green, 775 F.3d at 18. Even if we find that an abuse of discretion occurred, we will not order a new trial unless we also find that "the error in admitting evidence 'had a substantial and injurious effect or influence upon the jury's verdict.'" Id. (quoting Gomez v. Rivera Rodríguez, 344 F.3d 103, 118 (1st Cir. 2003)). Here, however, we discern no abuse of discretion in the admission of the challenged evidence, so our consideration stops short of any harmless-error inquiry.

To be admissible, evidence must be relevant, that is, it must have a "tendency to make" the existence of any fact that is of consequence to the determination of the action "more or less probable than it would be without the evidence." Fed. R. Evid.

- 42 -

401.  Even so, a court may preclude the admission of relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."  Fed. R. Evid. 403.  When the balancing of probative value and unfair prejudice ends in equipoise, Rule 403 tilts the decisional calculus in favor of admissibility.  See United States v. Whitney, 524 F.3d 134, 141 (1st Cir. 2008).

The court below determined that the stock-price evidence was relevant to the issues raised during the trial.  This determination was unimpugnable:  among other things, the evidence was relevant to the reasonableness of the directors' judgment in pursuing the merger as a means of creating value for shareholders.  And as the district court supportably found, this evidence was also relevant because the plaintiff class was challenging both the reasonableness of the stock-for-stock swap and the structure of the merger.  Finally, as in Gonsalves v. Straight Arrow Publishers, Inc., 701 A.2d 357, 362 (Del. 1997), the challenged data was relevant to "show that plans in effect at the time of the merger [had] born fruition."

Of course, the finding of relevance gets us only halfway home.  Even relevant evidence may be excluded if it is unfairly prejudicial.  The emphasis on unfair prejudice (as opposed to prejudice simpliciter) is not an idle formality.  After all, "[v]irtually all evidence is meant to be prejudicial, and Rule 403

only guards against unfair prejudice." United States v. Sabean, 885 F.3d 27, 38 (1st Cir. 2018). And it is no easy task to show unfair prejudice: we have made pellucid that, once a district court overrules a Rule 403 challenge and admits relevant evidence, "[o]nly rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse [the] district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).

In the case at hand, MAZ asserts that the admission of the stock-price evidence was unfairly prejudicial because it may have tainted the jury's perception of whether Shear's alleged breach of fiduciary duty caused the plaintiff class to sustain any economic loss. In effect, MAZ suggests that the admission of this evidence allowed Shear to make what amounted to a "no harm, no foul" argument even though the district court explicitly foreclosed such an argument. As MAZ sees it, this enabled Shear to introduce through the back door a line of defense that the district court had forbidden him to introduce through the front door.

There is, however, a clearly visible fly in the ointment: Shear never made a "no harm, no foul" argument to the jury. MAZ suggests, though, that given the stock-price evidence and what it showed about the profit that inured to the shareholders, the "no

- 44 -

harm, no foul" argument was the elephant in the room (and, therefore, the jury likely gave it weight).

We do not dismiss MAZ's suggestion lightly. At a minimum, there was some risk that the jury might have thought along "no harm, no foul" lines without any prompting from Shear. The district court concluded, however, that this risk did not substantially outweigh the probative value of the stock-price evidence.

Where Rule 403 is in play, battles over how to strike the balance between probative value and unfairly prejudicial effect are usually won or lost in the district court. This is not a mere fortuity: a trial court is in the best position to evaluate both the force of particular evidence and the likelihood of unfair prejudice. See Galarneau v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 504 F.3d 189, 206 (1st Cir. 2007) (noting that district court "observ[es] first-hand the nuances of trial" and, thus, merits substantial discretion when balancing probative value and prejudicial effect). In this instance, we do not think that the risk of unfair prejudice loomed so disproportionately large as to warrant second-guessing the district court's on-the-spot balancing of probative worth and prejudicial effect.

This conclusion is fortified by what transpired when the specter of prejudice from the stock-price evidence was brought front and center during a sidebar conference. After hearing from

the parties, the district court offered to give the jury a prophylactic instruction, limiting the permissible use of the stock-price evidence to relevant issues. MAZ refused the offer, opting instead for no instruction.

We long have recognized the value of limiting instructions. See, e.g., Rubert-Torres v. Hosp. San Pablo, Inc., 205 F.3d 472, 479 (1st Cir. 2000); Daigle v. Me. Med. Ctr., Inc., 14 F.3d 684, 690 (1st Cir. 1994). Such instructions, skillfully employed by a district court, often will eliminate — or at least mitigate — a risk of unfair prejudice. See United States v. Mehanna, 735 F.3d 32, 64 (1st Cir. 2013). When a party who objects to evidence declines the trial court's offer to caution the jury about the limited utility of that evidence, the objecting party is in a perilously poor position to complain, after the fact, that the evidence was unduly prejudicial. See United States v. Walter, 434 F.3d 30, 35 (1st Cir. 2006); United States v. Cintolo, 818 F.2d 980, 999 (1st Cir. 1987); Dente v. Riddell, Inc., 664 F.2d 1, 6 n.5 (1st Cir. 1981). So it is here.

We add a coda. Common sense suggests that MAZ's claim of prejudice is severely undermined by the jury's finding that the process undertaken by the directors in structuring the merger was not entirely fair. This finding is a telltale sign that, rather than succumbing to an unstated "no harm, no foul" argument, the jury found a foul and called it.

To say more about the challenged evidentiary ruling would be to paint the lily.  We conclude that the ruling was not an abuse of the district court's broad discretion.  It follows, therefore, that MAZ's attack on the denial of its new-trial motion is without force.

## IV. CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed.**    Two-thirds costs shall be taxed in favor of the plaintiff.